Wm. EISENBERG & SONS, Inc., to Use of ÆTNA CASUALTY & SURETY CO., v. UNITED STATES.

No. 44772.

Court of Claims.
March 1, 1948.

Frederick Schwertner, of Washington, D. C., for plaintiff.

Currell Vance, of Washington, D. C., and Peyton Ford, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and WHITAKER, HOWELL, MADDEN, and LITTLETON, Judges.

WHITAKER, Judge.

Plaintiff sues for alleged breaches of contract in connection with the construction of the Beach City Dam in Ohio. Plaintiff claims (1) that it was required to place in the dam materials excavated from other portions of the work, instead of being allowed to waste these materials in spoil areas; (2) that the defendant permitted another contractor to interfere with its construction of a dike; (3) that defendant delayed securing the relocation of a railroad that ran through the dam site; and (4) that for a substantial amount of the trench excavation defendant refused to pay it the price specified therefor.

The dam was located immediately to the east of the confluence of Sugar Creek and

a stream known as South Fork. It was an earthen dam. Upstream from it for about 400 feet the contract called for placing a blanket of earth in the bed of the streams to prevent the water from seeping underneath the dam. To the north of the dam, and as an extension of it, the contract called for the erection of a dike some 4,100 feet long.

■ 1. Materials placed in the dam.— The question presented is whether the contracting officer required plaintiff to place in the dam materials not called for in the specifications.

Plaintiff was required to construct an approach channel at the upstream side of the dam, and an outlet channel on the downstream side of the dam, and certain outlet structures and a spillway. It was also required to divert Sugar Creek into South Fork so that both streams would flow toward the dam through the approach channel.

The material removed from the approach channel, the outlet channel, the spillway, and the site of the outlet structures was to be used in the construction of the dam, or wasted in the spoil areas, as directed by the contracting officer.

Section 6–02(d), relating to the spillway, provided in part: "The materials from this excavation, when approved by the contracting officer, shall be used in the embankment, in the blanket, or in the fill in the stream channel, as directed by the contracting officer. * * *"

Section 6–02(e), relating to outlet structures and channels, provided in part: "Materials from these excavations, when approved by the contracting officer, shall be utilized in the embankment or fills, or stockpiled, for later use in the embankment * * *."

Such material for the dam as could not be secured from the required excavations was to be secured from borrow pit areas marked on the map D and G. Section 6–03 (b) relating to these areas provided: "The contractor will be required to excavate and haul from these areas as directed by the contracting officer. * * *"

Section 8–02 provided in part: "* * * The materials for embankment will be secured from the borrow pit areas specified on the drawing and from other required excavations. The final deposit of these materials in the embankment shall be under the direction of the contracting officer. * * *"

Finally section 8–05(a) provided: "* * * The required material shall be secured from the borrow pits designated in subparagraph (b) following, or from the excavation required under section VI of these specifications as directed by the contracting officer. * * *"

It will be seen, therefore, that the contract quite clearly lodged in the contracting officer the discretion of determining what was to be done with the materials excavated from the spillway and other works, and it committed to his discretion what materials were to be placed in the dam.

Plaintiff, however, contends that the contracting officer required it to mix unsuitable material obtained from the required excavation with suitable material obtained from the borrow pit areas. It says that the contracting officer should have allowed it to waste the alleged unsuitable material obtained from the required excavation and to have placed in the dam, instead, materials to be obtained from the borrow pit areas.

Plaintiff quite naturally would have preferred to handle the work in this way. Under the contract it was entitled to a certain number of cents per cubic yard for doing the required excavation, which included disposition of the material excavated. The contract also provided for a certain number of cents a cubic yard for excavating material in the borrow areas. If plaintiff was required to place in the dam the materials excavated from the required excavation areas, it could not secure payment for excavating an equal amount of material from the borrow pit areas. Besides, the spoil areas were closer to the required excavation areas than was the dam; hence, plaintiff would have had to haul the materials a lesser distance had it been permitted to waste them.

However, it was not for plaintiff to say whether or not the materials secured from

the required excavation were suitable to go in the dam. This was the prerogative of the contracting officer, as is clearly stated in the excerpts from the specifications quoted above. As the defendant very aptly says in its brief, "Under the specifications it was the exclusive function of the contracting officer to determine the suitability of material. As far as plaintiff was concerned, if the contracting officer approved the material, it was suitable."

Plaintiff was not required to mix materials obtained from the required excavation with materials secured from the borrow areas prior to placing the material in the dam, as was the case in Callahan Construction Co. v. United States, 91 Ct.Cl. 538. What it was required to do in certain instances was to place in a certain part of the dam a load of materials obtained from the borrow areas adjacent to a load of materials obtained from the required excavation. This was entirely proper and within the authority granted the contracting officer by the contract.

A cross section of the dam shows that pervious material was to be used at the extreme upstream side of the dam, and then impervious materials were to be used from there to the center of the dam. From the center of the dam to the pervious material on the downstream side of it, called the transition section, the materials were to be gradually less and less impervious. This was for the purpose of taking care of the water that of necessity would seep into the dam. The purpose was to let it run off, but to let it run off gradually without scouring out the dam. Hence, from the center of the dam to the downstream edge of it the materials were to become gradually less and less impervious.

In order to accomplish this the contracting officer from time to time directed that a load of impervious material be placed adjacent to a load of less impervious material, and, as they worked toward the downstream edge of the dam, there would be more and more of the less impervious materials used. Since some of the materials obtained from the required excavation were less impervious than some of the materials obtained from the borrow areas, or vice versa, plaintiff was required to place one or more loads obtained from the required excavation adjacent to a load obtained from the borrow areas, in order to accomplish the desired result. After the materials had been dumped, they were moistened and rolled with a sheeps-foot roller in order to impact them. This was the extent of the mixing.

No material was used in the dam which required plaintiff to do any more work than the contract contemplated. The contract required that each layer of the impervious embankment and of the transition section should be compacted by six complete trips of the sheeps-foot roller, and it also provided that if in the opinion of the contracting officer the desired compaction was not secured by these six trips, then the contractor should make three additional complete rollings, for which additional payment was to be made. However, the proof shows that in no case was there required more than the six complete trips. No additional trips were necessary. This clearly indicates that the materials used in the embankment were suitable to secure the desired results.

It is obvious, therefore, that the contracting officer exercised in a reasonable manner the discretion conferred upon him.

Plaintiff particularly complains of the fact that the contracting officer required it to place in the dam certain shale that was removed from the required excavation. It says that this was unsuitable material which it should have been allowed to waste. What we have said above, it would seem, sufficiently disposes of this claim. However, plaintiff points to a statement made in an "Analysis of Design, Beach City Dam," prepared by the Engineer Corps. This analysis, under the heading "Geological Investigations," said on page 7: "It is believed that the overburden and selected portions of the sandstone will be the only materials of excavation suitable for use in the embankment. The shales are quite unstable when exposed to weathering and should be wasted."

This was the opinion of the representatives of the Corps of Engineers before the work began, but it was in no sense binding on the contracting officer. It was within

that officer's discretion, as we have seen, to use shales if he thought they were suitable to secure the desired result. Moreover, this Analysis of Design was not available to plaintiff when it made its bid. Plaintiff could not have relied upon this statement, because it was ignorant of it. The contract documents which plaintiff had when it prepared its bid clearly left to the discretion of the contracting officer the selection of materials to go into the dam. When the shales were excavated he decided that they were suitable and he directed that they be used. The contract conferred upon him the power to do so. Of this plaintiff has no right to complain. Moreover, as we have pointed out above, the shales and all other material used produced a satisfactory result without extra labor.

Plaintiff is not entitled to recover on this item of its claim.

 2. Plaintiff's next claim is for interference with its construction of the dike. Borrow area G, from which the material was to be obtained for the construction of the dike, lay alongside the dike. The Baltimore and Ohio Railroad was to be moved from its then location to a line running east of the dike, part way between the dike and borrow area G, and part way within borrow area G.

Plaintiff says that the defendant permitted the Cable Company, the contractor who had the contract for the relocation of this railway line, to do its work in such way as to interfere with plaintiff's construction of the dike.

Plaintiff's contract set out that this railroad was scheduled to be relocated about June 1, 1936. The contract for its relocation was awarded May 23, 1935; it was due to be completed within 320 days after notice to proceed, which would have made the completion date some time in April 1936, had the defendant been able to promptly give the notice to proceed. However, there was considerable delay on the part of the Muskingum Watershed Conservancy District, an agency of the State of Ohio, in securing the required rights-of-way and for this reason notice to proceed was not given until September 5, 1935. On account of this delay and others, the date for the completion of the relocation was extended to September 9, 1936. Plaintiff under its contract was supposed to have finished the construction of the dike by December 2, 1935, well in advance of the contemplated completion of the relocation of the railroad.

Although notice to proceed with the work of relocating the railroad was not given until September 5, 1935, nevertheless prior thereto the contractor therefor was permitted to proceed with the work at its own risk. Its contract called for the consruction of 5¼ miles of railroad.

From the middle of July until August 5, 1935 the Cable Company was working on the southern portion of its contract, some distance below borrow area G. Early in August the work on the southern portion of the railroad line had to be discontinued because of flood conditions. The company was then given permission by the defendant to work within borrow area G. It commenced its work at the southeastern boundary of this area, where it constructed a cut from 15 to 20 feet deep and 75 feet wide for some distance through the center of this borrow area.

Plaintiff very vigorously protested against these operations. A number of conferences were held between plaintiff's representatives, the representatives of the Cable Company, and the defendant's engineers. As a result it was finally agreed orally that this deep cut would not be extended beyond the point where the railroad line left borrow area G. From this point northwestwardly it was agreed that the Cable Company would cut a ditch to no greater depth than 5 feet.

Until August 30 the Cable Company operated in conformity with this agreement. By that time it had excavated a cut from 4 to 5 feet deep for 1,200 feet northwest of the point where the railroad line left borrow area G. This was about 2,400 feet southeast of the northwest end of the dike. On August 30 it suspended all further operations.

However, plaintiff was notified by the defendant that it must put additional equipment on the dike work so as to construct the dike with the greatest dispatch, other-

wise it was warned that the Cable Company would be permitted to resume operations in the area and to excavate the cut for the railroad all the way down to subgrade. This would have made it extremely difficult and costly for plaintiff to have obtained any further material from borrow area G. In consequence plaintiff transferred to this area shovels, trucks, tractors and other equipment so as to complete the removal of the material from this area at the earliest possible time.

Under its contract plaintiff was required to complete the construction of the dike in 300 days after receipt of notice to proceed. As a result of putting additional equipment on this work, it completed it in 203 days, instead of 300. This, plaintiff says, put it to considerable additional expense.

Plaintiff says that it had planned to remove the material from borrow area G with LeTourneau scrapers. These machines operated quite economically. They cut the material, loaded it into the body of the scraper, and then moved it to the site where it was to be deposited. Plaintiff says, however, that these machines were not adapted to a long haul, and when the 15-foot cut was constructed through the southern portion of borrow area G, and it was, therefore, required to haul the material from this area around the cut, the resultant haul was so long that the LeTourneau scrapers could not be used to advantage. The steam shovels and trucks and tractors which it was required to use instead, it says, were much more expensive than the LeTourneau scraper. It says, furthermore, that the defendant's requirement that it put additional machinery to work in this area so as to complete the work at an earlier date than the time required for completion by the contract further increased its costs.

We do not think that the construction of the 15-foot cut through the southern portion of borrow area G increased plaintiff's costs. Before the construction of this ditch plaintiff was hauling material from this section of the area through a draw which ran north of the 15-foot cut. It hauled it through this draw rather than over the rise in ground immediately between the excavation area and the dike.

After the construction of the cut plaintiff still hauled the material through this draw. The construction of the cut did not require plaintiff to haul the material for a longer distance.

Nor did the excavation of the cut to a depth of 4 or 5 feet north of the point where the railroad line left borrow area G substantially interfere with plaintiff's operations. Plaintiff was required to remove material from this part of the borrow area to a depth of 4 or 5 feet, so that it resulted that the railroad cut was about on the same level as that to which plaintiff was required to go in its excavation. Furthermore, a cut of 4 or 5 feet formed no substantial obstacle to the movement of the tractors. It was only necessary for plaintiff to build earthen ramps for them to descend into the cut and to come out of it on the other side. Had the cut not been there, it would have been necessary for the tractors to go over the ridge that would have been left between the excavated area and the dike. (The contract prevented plaintiff from doing any excavation within the railroad right-of-way.) It was but little more difficult for the tractors to go down into the cut and out of it than it would have been for them to have gone over the ridge which would have been there had the cut not been made.

It is true plaintiff was required to complete the construction of the dike in advance of the contract completion date. This made it necessary for it to put additional equipment on the job, but apparently this equipment was obtained from other portions of the contract work. This slowed down the work in other areas, but we are unable to see how it delayed final completion of all the work. Plaintiff merely did first one portion of the work, instead of another portion which it had originally intended to do.

Nor do we see how it made the doing of the work any more expensive. One LeTourneau scraper could not have completed the work in the contract time in any event. In any case it would have been necessary for plaintiff to have used other equipment of the job or to have brought in additional LeTourneau scrapers.

It was the duty of the contracting officer to coordinate the work of the several contractors within the area to the best advantage. Both contracts contained this provision: "The Government may award other contracts for additional work, and the contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under other contracts as may be directed by the contracting officer. The contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor." In addition, the specifications, in paragraph 1-20, provided: " * * * As far as practicable, all contractors shall have equal rights to the use of all roads, grounds and adjacent streams. In cases of disagreement regarding such use, the decision of the contracting officer shall govern."

It was thus the duty of the contracting officer to fit the performance of one contract into the performance of the other, insofar as he could. The railroad line had to be relocated before plaintiff could complete its work. The old line ran through the dam, and that portion of the dam could not be completed until the railroad line was relocated. In order to adjust the work to be done under one contract with that to be done under the other, the contracting officer insisted that plaintiff finish the dike construction at an earlier date than that required, although this probably delayed the construction of other work under the contract.

This, it seems to us, was within his province. His decision was not arbitrary. He evidently acted conscientiously, and with a sincere desire to equitably resolve the differences between the parties. The proof does not show that his decision substantially interfered with the plaintiff in carrying out its contract, or that it rendered the performance of it any more expensive.

We are of opinion that plaintiff is not entitled to recover on this item.

 3. Plaintiff's next claim is for damages alleged to have been sustained as a result of delay in relocating the Baltimore and Ohio Railroad. The then line of the Baltimore and Ohio Railroad ran in an approximate east and west direction through the north portion of the dam at about the place where the dam connected with the dike. This line was to be moved, as heretofore stated, north and east of the dike.

Paragraph 1-17 of the specifications provided in part: " * * * The contractor will not be permitted to make the embankment closure between Station 12+30 and 16+10 until the Baltimore and Ohio Railroad at Station 14+35 has been relocated. The completion of the above-mentioned railroad relocation is scheduled for about June 1, 1936. * * *"

The contract for its relocation was awarded the, Cable Company, Inc., on May 23, 1935. The work was to be completed within 320 days after receipt of notice to proceed. This notice, however, was not given until September 5, 1935, because all the necessary rights-of-way had not been obtained before that time. As a result of this delay and of others hereinafter mentioned, the railroad was not relocated until October 15, 1936, or about 137 days after the date it had been scheduled to be relocated.

Defendant was not responsible for the delay in securing the necessary rights-of-way. These rights-of-way were to be obtained by the Muskingum Watershed Conservancy District, an agency of the State of Ohio. The defendant was in no way responsible for the delay in securing them or for the damages resulting therefrom.

Under the contract the Baltimore and Ohio Railroad was to deliver materials for the railway track by July 10, 1936, but delivery was not made until August 8, 1936. The defendant, of course, was not responsible for this delay.

There was a delay due to negotiations by the Baltimore and Ohio Railroad Company relative to the connection of a water line from the water tank on the relocated line at Beach City. The defendant was in no way responsible for this delay.

There was a further delay in connection with the erection of a bridge over Sugar Creek by a third contractor. For this, of course, defendant is not responsible.

There was a change in the type of tie-plates which defendant had a right to make under its contract which caused a delay of 20 days. For this delay, which is not shown to be unreasonable, defendant is not responsible. United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53.

For none of the delays was defendant responsible.

Furthermore, paragraph 1–04(f) of the specifications provided that if there was a delay in the relocation of the railroad, "the contracting officer will extend the required date of completion by a period of time equal to that lost by the contractor due to the delay after June 1, 1936, in completing the relocation of this railroad." It appears, then, that the parties contemplated the possibility of a delay. This negatives the idea that there was any promise on the part of the defendant to cause the relocation by any certain time, except for the implied obligation not to cause unreasonable delay. Cf. Walter A. Rogers et al. v. United States, 99 Ct.Cl. 393, 411. If not, there can be no liability.

Plaintiff is not entitled to recover on this item of its claim.

4. Plaintiff's next claim is for payment for certain trench excavation. It was paid for at 69 cents a cubic yard as rock excavation; it claims $4.00 a cubic yard for trench excavation.

Paragraph 6–06 of the specifications provided in part: "Rock Excavation for Spillway, Outlet and Stilling Basin Structures and Channels.—This excavation will include all excavation classified as rock, within the lines indicated on the drawings or staked in the field for these structures except rock trench excavation. * * *" This was to be paid for at 69 cents a cubic yard. Section 6–07, relating to rock excavation for trenches, was to be paid for at $4.00 a cubic yard.

On the north of the approach channel and between it and the blanket on the bottom of the streams a retaining wall was to be erected on a concrete footing or foundation 6½ feet to 12½ feet wide. A trench had to be excavated for this foundation. The trench was 3 feet deep and from 6½ feet to 12½ feet wide. Plaintiff was paid for this trench excavation at 69 cents a cubic yard. It claims payment at $4.00 a cubic yard.

There were walls on each side of the stilling basin. They were erected on concrete footings from 14.83 to 22½ feet wide. Plaintiff was paid for the excavation of these trenches at 69 cents a cubic yard, whereas it claims $4.00 a cubic yard.

Underneath both of these footings there was excavation for cut-off keys. The excavation for these cut-off keys has been paid for at $4.00 a cubic yard. It is only the excavation for the footings that is in controversy.

One of the chief reasons for the much larger amount to be paid for trench excavation over that paid for other rock excavation was the requirement of section 6–01 (h) of the specifications, to wit: "Heavy blasting will not be permitted against rock which will form the final foundation, but the foundation must be prepared by drilling, picking, barring, wedging, and similar methods which will leave the rock of the foundation in an entirely solid and unshattered condition. * * *"

This requirement made it necessary for plaintiff to excavate the trenches for these footings without blasting, but, as specified, by drilling, picking, barring, wedging, etc. Although the trenches for these footings were quite wide, they nevertheless had to be excavated in the manner described and, therefore, are to be paid for at the higher rate.

As a matter of fact, previous to inviting bids for this contract, the defendant in computing the amount of rock excavation to be paid for at $4.00 a cubic yard included the trenches for these concrete footings, both in the approach channel and in the stilling basin.

There was a total of 1,296.6 cubic yards of this trench excavation. We are of opinion that the plaintiff is entitled to recover therefor the difference between the amount paid it at 69 cents a cubic yard and the amount due it at $4.00 a cubic yard.

Plaintiff is entitled to recover on this item the sum of $4,291.75.

1014

Against this amount the defendant is entitled to recover of the plaintiff for unpaid Social Security taxes, penalty and interest the sum of $1,488.73, together with interest according to law on $37.81 from July 10, 1938, and on $6.31 from July 10, 1938, and on $1,444.61 from May 10, 1938, all to date of judgment.

Judgment for the net amount $1,927.59 will be entered in favor of the plaintiff. It is so ordered.

JONES, C. J., and HOWELL, MADDEN, and LITTLETON, JJ., concur.