No. 47267.

United States Court of Claims.

April 3, 1950.

NEWHALL–HERKNER CONST. CO. et al. v. UNITED STATES.

No. 46074.

United States Court of Claims.

April 3, 1950.

Harry D. Ruddiman, Washington, D. C., for the plaintiffs. King & King, Washington, D. C., were on the briefs.

G. V. Palmes, Washington, D. C., with whom was Assistant Attorney General H. G. Morison, for the defendant.

Before JONES, Chief Judge, and WHITAKER, HOWELL, MADDEN, and LITTLETON, Judges.

WHITAKER, Judge.

Plaintiffs entered into a contract with the defendant for the construction of Pleasant Hill Dam, located on Clear Fork, Mohican River, near Perrysville, Ohio. Except for the items which have been abandoned, plaintiffs sue for certain excess costs and for delays caused by various things.

## Recess Joint Claim

■ Plaintiffs' first claim is for the excess cost of leaving a recess in the floor slab of the operating house.

The plans indicated that the floor slab of the operating house might be constructed with but one pouring of concrete. The plaintiffs so interpreted them, and the resident engineer, who was the representative of the contracting officer assigned to supervise this particular job, agreed.

The contractors, accordingly, installed the necessary forms and reinforcing steel for one pour of concrete. However, before the pour was made, the District Engineer, having been apprized of the contractors' plans, ruled that it would be necessary to leave a recess around a slot in the floor designed to receive the gate stems for the hoists for the gate of the dam. The contractors were required to provide this recess. They sue for the excess cost of doing so.

The District Engineer, who was the contracting officer, approved the claim for these excess costs, but he was reversed by the Chief of Engineers, who held that the plans, properly interpreted, showed the necessity for this recess.

The Commissioner has found that this ruling was arbitrary and unreasonable. We concur. The plans did not show this recess. Plaintiffs may recover the excess cost of doing this work, in the sum of $242.62.

## Flood Damage Claim

■■ After plaintiffs had made the necessary excavation for the impervious section of the dam, but before the upstream cofferdam had been completed, a flood came which washed into the excavated area some 8,000 cubic yards of material. Plaintiffs sue for the cost of removing it. This was disallowed by the contracting officer and, on appeal, by the Chief of Engineers.

Plaintiffs base their claim on paragraph 1-12(b) of the specifications which reads:

"1.12. Flooding of Cofferdams and/or Protection Levees. * * *

"(b) In the event that a flood overtops the cofferdams and/or levees where built and maintained to full effective height, and in accordance with the approved drawings, with resultant injury to the permanent work within the cofferdam and/or levees, the contractor will be required to restore such work at the unit contract prices."

Plaintiffs say that the foundation for the dam was a part of "the permanent work within the cofferdam," that the washing of these materials into it damaged it, and therefore that they are entitled to the cost of removing them.

It is at least doubtful whether plaintiffs can bring their claim within this paragraph since the upstream cofferdam had not been completed, as the commissioner's 22nd finding shows, to which no exception was taken and which we have adopted as a correct finding. Paragraph 1-12(b) related to damage to the permanent work after the cofferdams had been "built and maintained to full effective height." Before that time it seems probable that it was contemplated that the contractor would have to run the risk of flood damage.

Defendant, on the contrary, says plaintiffs' rights are determined by paragraph 5-01(e) (2) of the specifications relating to "common excavation." This paragraph provides for surveys for excavations to be made and for payment based on these surveys, and then says:

"* * * The contractor shall remove material which has been deposited subsequent to the above-mentioned survey by

floods, rains, or other causes, and no payment will be made for such excavation. * * *"

It is at least plausible to say that this paragraph is determinative of plaintiffs' rights.

This case arises under one of those government contracts which in article 15 gives finality to the decisions of the contracting officer, affirmed on appeal, not only as to questions of fact, but as to all "questions arising under this contract." Under the Supreme Court's decision in United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, these questions include the interpretation of the requirements of the contract. By the contracting officer's decision on such a question we are bound, unless it is arbitrary or capricious or evidently lacking in that good faith required of an impartial arbiter. Plaintiffs do not bring their case within this exception. The decision of the contracting officer appears to us to have been a reasonable one and, hence, we are bound by it.

### Labor Claim

■ This contract was entered into for the purpose, in part, of relieving unemployment. It required that:

"To the fullest extent possible, labor required for the project and appropriate to be secured through employment services shall be chosen from the lists of qualified workers submitted by local employment agencies designated by the United States Employment Service. * * *" However, plaintiffs were notified by paragraph 1–35 of the specifications that sufficient labor was not available in the immediate vicinity of the work. The nearest United States Employment Service office was at Ashland, Ohio, some twenty miles from the site of the work. Plaintiffs' requests for labor were submitted to this office.

The proof shows that this agency did all it could do to supply plaintiffs with the labor they required and that, when it was unable to do so, the contracting officer gave plaintiffs permission to get skilled labor wherever they could, although he still required them to first apply to the Employment Service for unskilled labor before permitting them to secure it elsewhere.

We are of opinion the contracting officer fairly administered this provision of the contract. Plaintiffs were put on full notice of the requirements of the contract relative to the procurement of labor, and we think that no more than this was demanded of them. They are not entitled to recover on this item of their claim.

### Delay in Removal of Oil Pipe Line

■ The findings show that it was necessary to remove a pipe line before plaintiffs could construct the inlet and outlet works. This pipe line was to be removed by another contractor under a separate contract. There was a delay of 35 days in removing it due to a delay in securing the necessary right-of-way to which the pipe line was to be removed. This right-of-way was to be provided by the Muskingum Watershed Conservancy District, an agency of the State of Ohio. Defendant had nothing to do with the securing of this right-of-way, and since the delay in removal of the oil pipe line was occasioned by the delay in securing it, defendant is not liable therefor.

■ It is true that paragraph 3–01(c) of the specifications provided, "The gas and oil pipe lines will be moved outside the work area by other agencies sufficiently in advance of construction as to not interfere with the contractor's operations and this work will not be included in this contract." This must be construed to mean, however, we think, that it was *expected* that these gas and oil pipe lines would be removed early enough so as not to interfere with the contractors' operations, since paragraph 1–04 (e) clearly contemplated that there might be a delay in their removal. It provided:

"In case the present gas and oil lines have not been relocated at the site of the works so as not to interfere with the contractor's operations as mentioned in paragraph 3–01, the contracting officer will extend the required date of completion, by a period of time equal to that lost by the contractor due to the delay in the relocation of the gas and/or oil lines."

It was, therefore, within the contemplation of the parties that there might be a delay in the removal of these lines, and, hence, paragraph 3–01(c) cannot be construed as a warranty that these lines would be removed early enough not to interfere with the contractor's operations. This was the view we took of a similar provision in William Eisenberg & Sons, Inc., to Use of Aetna Casualty & Surety Co. v. United States, 75 F.Supp. 1006, 110 Ct.Cl. 388, 429, 430.

### Spillway Delays

█ In order to prevent the water from overtopping the dam a tunnel was driven a certain distance into the dam a few feet below the top of it, and then a transverse tunnel was built running longitudinally with the dam to the abutment, and then a vertical shaft was excavated, at the top of which there was a "morning glory" funnel, out of which the water was discharged downstream.

In the excavation of these tunnels and shafts it was contemplated originally there would be 194,200 cubic yards of rock excavation. It was thought that 65,000 cubic yards of this was suitable to be placed in the embankment and it was planned to waste the balance. The contractors computed that in the doing of this practically all of the materials to be placed in the dam could be placed directly therein, making it unnecessary to stockpile more than 3,000 cubic yards of it. However, it developed that there was more of the excavated material which was suitable for placement in the dam than had been expected and the contracting officer directed that an estimated additional amount of 153,180 cubic yards of rock excavation should be placed in the dam. No provision was made in the order for the extra cost of stockpiling more than the 3,000 cubic yards which plaintiffs had originally expected to stockpile. Plaintiffs protested against this, and after a conference the District Engineer authorized plaintiffs to stockpile such material as could not be immediately placed in the dam in borrow pits "I" and "M," and it was agreed that plaintiffs would be paid 25 cents a cubic yard for the rehandling of this material.

Notwithstanding this agreement, however, the resident engineer refused to pay for the rehandling of the material out of the stockpile. The record points to no excuse for this refusal. Because he would not pay for it, plaintiffs deferred any rock excavation until they could immediately place the rock in the dam without first stockpiling it. This caused delays in rock excavation.

However, plaintiffs did not protest to the contracting officer as they were required to do by paragraph 1–27 of the specifications, nor did they notify the contracting officer that they were being delayed by the action of the resident engineer, as they were required to do by article 9 of the contract. Not only did plaintiffs fail to so protest and to so notify the contracting officer, but they expressly refused to do so when the resident engineer inquired as to whether or not they desired to register a protest. For this reason plaintiffs are not entitled to recover on this item.

Furthermore, although the record shows that there was a suspension of rock excavation for a total period of 73 days on account of the refusal of the resident engineer to pay for the rehandling of the material placed in the stockpile, nevertheless, it is doubtful whether or not the completion of the work was delayed for this full time, nor is it shown to what extent its completion was delayed. Throughout the period of this delay plaintiffs were experiencing other delays due to the incompetence and inexperience of their subcontractor in the performance of the excavation and concreting of these tunnels. Whereas plaintiffs' progress schedule showed that these tunnels would be excavated and concreted in a period of six months, it actually required plaintiffs a total of thirteen months to complete them, a little more than twice as long as plaintiffs had estimated. Some of this delay was occasioned by the incompetence and inexperience of the subcontractor. Whether or not the delay from this cause ran concurrently with the entire 73 days of delay due to the refusal of the resident engineer to pay for the rehandling of the material placed in the stockpile, we are unable to ascertain from the testimony.

In any event, however, it is clear that plaintiffs are not entitled to recover on account of their failure and refusal to protest and to notify the contracting officer of the delay, as required by article 9 of the contract.

### Delay Due To The Construction of Impervious Blanket

When the contract was let it was thought that ledge rock extended across the entire width of the stream. However, when the stream was diverted and the area had been stripped, it was found that ledge rock did not extend across the width of the stream, and consequently it was thought necessary to place an impervious blanket in the area in order to prevent the water from seeping underneath the dam. Plaintiffs were ordered to do this work by letter dated May 13, 1937, and were later advised that the cost of the work would be determined after it had been completed, and that a change order would then be issued. A change order for this work was originally issued in July 1937, and a final change order was issued on September 2, 1938. The delay in issuing this final change order was occasioned by the time consumed in determining the additional cost to be allowed.

In order to do this additional work the contractors had to take off of the other contract work two shovels. These shovels were used for a period of fifteen days, and the contracting officer determined that the contract work as a whole had been delayed by this time, and plaintiffs were given a corresponding extension of time.

Plaintiffs claim they were delayed on account of this change from May 12, 1937, to June 8, 1937, but this is not supported by the evidence. The preponderance of the evidence shows that the contract work as a whole was not delayed beyond the fifteen days allowed by the change order.

Inasmuch as the contract provided for the making of changes, plaintiffs are not entitled to recover for the delay incident thereto, since we are of the opinion that the time consumed in deciding on this change was reasonable.

### Delay Due To Substituting Key Wall For Key Trenches

After the area for the dam had been cleaned off it was found that the rock was shattered in certain places and was almost vertical, which made it impossible to construct the key trench and key wall in the manner provided for in the original plans. Accordingly, a change order was issued directing the substitution of a single reinforced concrete key wall from elevation 1020 to 1083.5. This prolonged the work for a period of fifteen days, for which an extension of time was granted, and plaintiffs were paid the cost of the additional work.

Inasmuch as the contract provided for changes, the defendant is not liable for the delay incident thereto.

Plaintiffs' claim that the delay was caused by the failure of the resident engineer to provide drawings and reinforcing steel diagrams is not supported by the evidence. Plaintiffs are not entitled to recover on this item.

### Delay Due To Pouring Floor Slab In Two Operations

We have allowed plaintiffs the cost of pouring this floor slab in two operations instead of one, but we are of the opinion that the delay incident thereto did not delay the final completion of the whole work. During the period of delay plaintiffs were engaged on other work.

### Delay In Excavation Of West Access Road And West Abutment

The claim under this item is based upon the same contention as the claim for the spillway delays, that is, that the resident engineer did not permit the stockpiling of rock which had been excavated. What we have said on that claim is applicable here. Nor are we satisfied that the final completion of the job was delayed any longer by doing this particular work in the manner in which it was done than it would have been had plaintiffs excavated the rock and stockpiled it.

Plaintiffs' other claims have been considered, but have been found to be without merit.

Plaintiffs are entitled to recover the sum of $242.62. Judgment for this amount will be entered.

HOWELL, MADDEN, and LITTLETON, Judges, and JONES, Chief Judge, concur.