**J. A. ROSS & CO. v. UNITED STATES.**

No. 48882.

United States Court of Claims.

Oct. 6, 1953.

O. R. McGuire, Washington, D. C., for plaintiff. Ivy Lee Buchanan, Washington, D. C., on the brief.

Carl Eardley, Washington, D. C., with whom was Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

188

**WHITAKER, Judge.**

On September 14, 1943, plaintiff and defendant entered into a contract whereby plaintiff agreed to furnish all labor and material and to perform all work necessary for the placement of concrete pavement, hard standings, and drainage at Erie Proving Ground, LaCarne, Ohio. This contract was modified on the following day, September 15, 1943. As modified the contract contained 59 separate items of work, for which plaintiff was to be paid an estimated consideration of $712,153.00, based upon unit prices for the estimated quantities of work.

Plaintiff sues on four causes of action.

## Cause of Action No. 1

Its first cause of action is for $34,624.-64, compensation claimed for placing 12,-683.02 cubic yards of base course material at the contract unit price of $2.73 per cubic yard. Plaintiff alleges that this material was used in the performance of the contract work, but that it has not been paid for. The proof shows that this material was in fact used in the performance of the entire contract work and that it has not been paid for. The facts underlying the controversy over defendant's liability to pay for it follow:

The contract as modified called for the placement of two kinds of paving: (1) 140,583.45 square yards of concrete paving, and (2) 75,980.96 square yards of crushed stone surfacing or macadam pavement, sometimes called hard standings. Beneath the concrete pavement there was to be placed a base course of compacted stone or slag five inches in depth, and beneath the macadam pavement there was to be placed a similar base course six inches in depth. Plaintiff was also to do the necessary grading and filling preparatory to placing the base course. Measurement of the material placed in the base course, for the purpose of determining the amount to be paid, was to be based upon the volume of material measured between the lines and grades established for the subgrade and the lines and grades established for the top of the base course.

The amount of material to be placed in the base course, based on 5 inches under the concrete and 6 inches under the macadam pavement, was 32,188.2 cubic yards. The plaintiff has been paid for 46,132.08 cubic yards. It would, therefore, appear that plaintiff has been paid at least as much as that called for by the specifications.

The difference between the amount paid for and the amount specified for the base course is to be accounted for in large part by the amount of base course material that went into the fills. Section 3–02(b) of the specifications required that base course material be placed in the fills where the fills were 6 inches or less in depth, and in fills of more than 6 inches in depth where this was required by the contracting officer. No specific provision was made for payment for base course material placed in fills, but evidently this material was taken into account in measuring the base course material to be paid for.

The amount paid for exceeds by 13,-943.88 the amount specified for the base course, but there remains 12,683.02 cubic yards that were used, but which has not been paid for. Most of this sunk into the ground below the lower line of the base course. The reason for this is that a good deal of the base course material was laid on soggy ground, and when the heavy rollers were rolled over it in order to compact it, it sunk into the ground below the lower measurement line for the base course material.

The ground was soggy because the plaintiff, who was charged with the duty of draining the site, had been unable to drain it successfully. Shortly after plaintiff began laying the base course, rather heavy rains fell on the site and the drainage provided did not take care of it. There is no serious allegation that the defendant was in any way responsible for the soggy nature of the ground.

The basis of plaintiff's claim is that the defendant required it to place the

base course material on soggy ground, and that this was in violation of the terms of the contract. Plaintiff relies on that provision of section 3–02(b) of the specifications relating to grading, which reads as follows:

"* * * Fill shall not be placed in areas where the surface material is frozen or wet. * * *"

Defendant says that this provision applied to earth fill and not to stone fill.

This is the way the contracting officer construed the specifications, and we cannot say that this was wrong. We quote below in full the paragraph of the specifications in which this sentence appears:

"3–02. Excavation and grading.
* * * * * *

"(b) *Grading.* Grading operations in areas where no excavation is required shall be as directed by the contracting officer. No over-all stripping is contemplated but grading shall be sufficient to provide an adequate foundation. Fills shall be constructed of base course material in all areas where the required fill is six (6) inches or less in depth. Where the total thickness of base course and fill exceeds eight (8) inches the material shall be placed in courses not to exceed six (6) inches in depth. Placing and rolling shall be in accordance with the requirements of paragraph 3–03(c). In areas where the required fill is greater than six (6) inches in depth the fill shall be constructed of base course material or compacted earth as directed by the contracting officer. Compacted earth fills shall be constructed with material obtained from excavation or borrow which has been approved by the contracting officer for that use. Areas to be filled shall be stripped of unsuitable material as directed and loosened by scarifying sufficiently to provide a bond with material placed for the fill and shall be dampened if required. Fill shall not be placed in areas where the surface material is frozen or wet. Material to form the earth fill shall be placed in layers not to exceed six (6) inches (loose measure) in thickness and at the optimum moisture content for compaction by the equipment used, as determined by the contracting officer. The contractor may be required to add water or to allow the material to dry before compacting. When moisture content and condition of the spread material are satisfactory to the contracting officer, the material shall be rolled with an approved type, tractor drawn, sheeps-foot roller until compacted to a density equivalent to that of adjacent undisturbed subgrade material. The compaction operation shall in no case consist of less than six (6) passes of the tractor and roller unit on each square foot of each layer. In areas not accessible to power equipment, the compacting may be done by other methods which will provide equivalent compaction and achieve the required density if approved by the contracting officer."

It will be observed that the first part of the paragraph applies to the use of base course material in the fills, and it would seem that the last part relates to earth fills. The seventh sentence begins, "compacted earth fills shall be constructed." The rest of the paragraph seems to relate only to earth fills, although this is not necessarily so. Earth could not successfully be used in a fill if it was laid on soggy ground, but there would seem to be no reason for prohibiting a contractor from laying crushed stone on soggy ground if he wished to do so. If some of it sunk into the mud, he could still get a good fill by laying more stone on top of it. On the other hand, it is to be doubted that the contracting officer would have permitted the laying of crushed stone on frozen ground.

Plaintiff, however, evidently did not think while it was laying the base course that the laying of crushed stone on soggy ground was contrary to the con-

tract requirements, because it either did so voluntarily or did not protest against being required to do so.

There is sharp controversy as to whether or not the defendant ever required plaintiff to place the base course material on soggy ground. The weight of the evidence is that the defendant did not do so directly, but defendant did continually urge plaintiff to speed up the work, and this could not have been done except by placing the base course material on soggy ground, since the drainage plaintiff had installed had proved inadequate.

But even if defendant had given plaintiff a direct command to place this material on this soggy ground, and even if this was in violation of the contract, there is no proof that plaintiff registered any protest against doing so. In the absence of a protest, we do not think plaintiff is entitled to recover. Whenever the defendant orders work done which the plaintiff thinks is in violation of the contract, or in addition to its requirements, plaintiff is required to protest against doing it, or to secure an order in writing before doing it. It is basic in all Government contracts that the plaintiff cannot do work which it is not required to do by the contract, without registering a protest against being required to do it, or securing an order for extra work, and then later make a claim against the Government for additional compensation.

If the plaintiff thought that an unforeseen condition had been encountered which necessitated revision of the contract, it was its duty to call that situation to the attention of the contracting officer, so that he could investigate the condition and make an equitable adjustment in the contract, in case the conditions warranted it. Or, if plaintiff claimed that the contract had been changed in a way which increased the cost of doing the work, it was necessary for it to make claim therefor in order that the contracting officer might make an equitable adjustment. If the plain-

tiff claimed that extra work was being required of it, the contract expressly provided that it is not entitled to compensation therefor, unless the extra work is ordered in writing by the contracting officer and the price stated in the order. All of these requirements are for the purpose of protecting the Government against having to pay more than it committed itself to pay when the contract was signed, unless authorized by an officer authorized to contract for it. Contracting officers are rarely on the ground where the work is going on, and the Government by these provisions undertook to protect itself against claims for additional compensation because of an act of a subordinate of the contracting officer, which required something to be done not called for by the contract.

Plaintiff never protested against placing this base course material on this wet ground, and for this reason we think it is not entitled to recover.

Plaintiff may have been led not to protest against placing this material on soggy ground, because its monthly vouchers for the materials placed in the base course were paid in full when presented, and it was not until after the contract had been completed and the materials in the base course had been measured for final payment that it was required to accept a deduction of a portion of the amount that had been paid to it. However, we do not think even this factor excuses plaintiff from having failed to protest against placing this material on wet ground. The contract expressly provided that payment for the base course would be measured between the subgrade line and the top of the base course. Plaintiff knew this, and, therefore, knew that any material that sunk below the subgrade line might not be paid for. Hence, if the condition of the ground was such that it was reasonable to suppose that some of the material would sink below the subgrade line, it was its duty to protest against being required to place it on such ground, if it was of the opinion that the contract did

not require it to do so. (That it did not protest indicates it was not of this opinion.)

We do not think plaintiff is entitled to recover on this cause of action, although we have arrived at this conclusion with much hesitation, because plaintiff has been paid for only some 46,000 cubic yards of base course material, whereas it actually placed about 59,000 cubic yards.

### Causes of Action Nos. 2 and 3

Plaintiff was required to remove 1,-351.9 cubic yards of base course material from one area, and 364.47 cubic yards from another area, and to replace it with other base course material. It sues for the cost of excavating this material and replacing it with other base course material at the unit prices set out in the contract.

■ We do not think it is entitled to recover on either of these two causes of action, because it is undisputed that mud had oozed up into the base course material in these two areas, making it entirely unsuitable as a base course. When the defendant discovered this, it ordered it removed, as it was entitled to do under article 6 of the contract, giving the Government the right to reject defective material and workmanship and require its correction.

Furthermore, when the plaintiff made demand for payment for the material removed from one of these areas, the contracting officer ruled against it, holding that he was entitled to demand that this base course material, which had been impregnated with clay, should be removed. From this ruling plaintiff took no exception or appeal. For this additional reason plaintiff is not entitled to recover on these causes of action.

### Cause of Action No. 4

In this claim plaintiff seeks to recover $71,077.09, alleged to represent increased costs incurred by plaintiff subsequent to December 2, 1943, the original completion date of the contract, because of delays caused by defendant. The contract work was completed on February 19, 1944, some 79 days after the scheduled date.

Plaintiff began operations in priority area No. 1 on September 21, 1943. Thereafter plaintiff encountered a number of unforeseen conditions and defendant ordered a number of changes and extra work. In two instances, defendant unreasonably delayed plaintiff in changing the contract. As to all other modifications, resulting from changes or otherwise, defendant authorized and directed plaintiff to proceed with reasonable promptness, and issued modifications equitably compensating plaintiff for additional costs.

■ The possibility of changes and delays necessarily incident thereto was in the contemplation of the parties, or should have been. Defendant reserved, by articles 3 and 4 of the contract, the right to make changes, and by article 5 of the contract the right to order extra work. For any necessary delays resulting from the exercise by the Government of some reserved right there is no liability. Stafford v. United States, 74 F. Supp. 155, 109 Ct.Cl. 479; Parish v. United States, 98 F.Supp. 347, 120 Ct.Cl. 100, and numerous other cases.

There is, however, an implied obligation on the part of the United States not to cause unreasonable delay in making permitted changes in the contract, for the breach of which plaintiff is entitled to recover whatever damages it has suffered thereby. See, among others, William Eisenberg & Sons v. United States, 75 F.Supp. 1006, 110 Ct.Cl. 388. Defendant has breached this implied obligation in two instances in this case.

Plaintiff was unreasonably delayed a total of 15 days in priority area No. 3 while consideration was being given to the type of steam tunnel to be installed.

The Government had surveyed this tunnel on September 24, 1943, and had decided that the wooden closure should be replaced by a concrete one and asked plaintiff to submit a proposal for doing the work. This plaintiff did, but a week

later the Government changed its mind, furnished plaintiff revised plans, and asked for another proposal. This was submitted and work finally started on October 26. It was thus over a month between the time this tunnel was surveyed by the Government and the time the plaintiff was able to proceed. It was 24 days after plaintiff ran into the tunnel in its grading operations before it could proceed again. This was an unreasonable delay, to the extent of 15 days at least.

It was granted an extension of time of 15 days and an increase in price of approximately $15,000 for the additional work required, but it has not been compensated for its excess costs incident to the delay. This it is entitled to recover. It is entitled to recover this, notwithstanding the fact that it accepted the extension of time and the $15,000 for the cost of the additional work without reserving the right to sue for the excess cost incident to the delay. The delay was a breach of contract. The amount paid was not in satisfaction of damages for the breach of the contract, nor was the extension of time given.

Plaintiff was also unreasonably delayed 29 days in connection with the installation of the 6-inch water main running along the west side of buildings 119, 120, 123, 124 and 133 of the warehouse area. The existing water main in this area did not appear on the contract drawings, but on November 2, after it was discovered, the defendant took elevations of the main, and after some discussion finally determined to install a new water line at a lower elevation. It was not until December 7, 1943, that plaintiff was ordered to proceed with the installation of the new water main. In the meantime, work was held up in the area. The contracting officer recognized that plaintiff had been delayed 29 days incident to the installation of this waterline, and granted an extension for such time.

We think the delay during the period from November 2 to December 7, 1943, was unreasonable and that plaintiff is entitled to recover its excess cost incident to 29 days of the delay. Plaintiff was paid $4,000 for the installation of this new main, but it has not been compensated for its increased cost resulting from the unreasonable delay in determining what to do. This, as in the case of the 15-day delay, was a breach of contract for which plaintiff is entitled to recover.

In this case plaintiff accepted the $4,000 "without prejudice or any claim for increased costs resulting from delays in performance"; but, independent of this reservation, we think plaintiff is entitled to recover, because this was a breach of contract.

We have carefully considered plaintiff's other claims for delay, but we think they are without merit. There were other delays, it is true, but such of them as were caused by defendant were not breaches of the contract. The facts with reference to them are set out in findings 41 to 56.

For the 44 days which we have found plaintiff was unreasonably delayed, it is entitled to recover its excess costs consisting of $7,331.31 for the cost of mixing, placing, and curing concrete; $3,792.36 for overhead and supervision; $7,707.04 for equipment cost; and $3,062.28 for loss of efficiency due to having to perform the concrete work in cold weather, or a total of $21,892.99. Judgment for this amount will be entered for plaintiff against defendant.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.