Whitaker, Judge,
delivered the opinion of the court:
On September 14, 1943, plaintiff and defendant entered into a contract whereby plaintiff agreed to furnish all labor and material and to perform all work necessary for the placement of concrete pavement, hard standings, and drainage at Erie Proving Ground, LaCarne, Ohio. This contract was modified on the following day, September 15,1943. As modified the contract contained 59 separate items of work, for which plaintiff was to be paid an estimated consideration of $712,153.00, based upon unit prices for the estimated quantities of work.
Plaintiff sues on four causes of action.
CAUSE OK ACTION NO. 1
Its first cause of action is for $34,624.64, compensation claimed for placing 12,683.02 cubic yards of base course material at the contract unit price of $2.73 per cubic yard. Plaintiff alleges that this material was used in the perform- *326 anee of the contract work, but that it has not been paid for. The proof shows that this material was in fact used in the performance of the entire contract work and that it has not been paid for. The facts underlying the controversy over defendant’s liability to pay for it follow:
The contract as modified called for the placement of two kinds of paving: (1) 140,583.45 square yards of concrete paving, and (2) 75,980.96 square yards of crushed stone surfacing or macadam pavement, sometimes called hard standings. Beneath the concrete pavement there was to be placed a base course of compacted stone or slag five inches in depth, and beneath the macadam pavement there was to be placed a similar base course sis inches in depth. Plaintiff was also to do the necessary grading and filling preparatory to placing the base course. Measurement of the material placed in the base course, for the purpose of determining the amount to be paid, was to be based upon the volume of material measured between the lines and grades established for the subgrade and the lines and grades established for the top of the base course.
The amount of material to be placed in the base course, based on 5 inches under the concrete and 6 inches under the macadam pavement, was 32,188.2 cubic yards. The plaintiff has been paid for 46,132.08 cubic yards. It would, therefore, appear that plaintiff has been paid at least as much as that called for by the specifications.
The difference between the amount paid for and the amount specified for the base course is to be accounted for in large part by the amount of base course material that went into the fills. Section 3-02 (b) of the specifications required that base course material be placed in the fills where the fills were 6 inches or less in depth, and in fills of more than 6 inches in depth where this was required by the contracting officer. No specific provision was made for payment for base course material placed in fills, but evidently this material was taken into account in measuring the base course material to be paid for.
The amount paid for exceeds by 13,943.88 the amount specified for the base course, but there remains 12,683.02 cubic yards that were used, but which has not been paid for. *327 Most of this sunk into the ground below the lower line of the base course. The reason for this is that a good deal of the base course material was laid on soggy ground, and when the heavy rollers were rolled over it in order to compact it, it sunk into the ground below the lower measurement line for the base course material.
The ground was soggy because the plaintiff, who was charged with the duty of draining the site, had been unable to drain it successfully. Shortly after plaintiff began laying the base course, rather heavy rains fell on the site and the drainage provided did not take care of it. There is no serious allegation that the defendant was in any way responsible for the soggy nature of the ground.
The basis of plaintiff’s claim is that the defendant required it to place the base course material on soggy ground, and that this was in violation of the terms of the contract. Plaintiff relies on that provision of section 3-02 (b) of the specifications relating to grading, which reads as follows:
* * * Fill shall not be placed in areas where the sur- ' face material is frozen or wet. * * *
Defendant says that this provision applied to earth fill and not to stone fill.
This is the way the contracting officer construed the specifications, and we cannot say that this was wrong. We quote below in full the paragraph of the specifications in which this sentence appears:
3-02. EXCAVATION AND GRADING.
(b) Grading. Grading operations in areas where no excavation is required shall be as directed by the contracting officer. No over-all stripping is contemplated but grading shall be sufficient to provide an adequate foundation. Fills shall be constructed of base course material in all areas where the required fill is six (6) inches or less in depth. Where the total thickness of base course and fill exceeds eight (8) inches the material shall be placed in courses not to exceed six (6) inches in depth. Placing and rolling shall be in accordance with the requirements of paragraph 3-03 (c). In areas where the required fill is greater than six (6) inches in depth the fill shall be constructed of base *328 course material or compacted earth as directed by the contracting officer. Compacted earth fills shall be constructed with material obtained from excavation _ or borrow which has been approved by the contracting officer for that use. Areas to be filled shall be stripped of unsuitable material as directed and loosened by scarifying sufficiently to provide a bond with material placed for the fill and shall be dampened if required. Fill shall not be placed in areas where the surface material is frozen or wet. Material to form the earth fill shall be placed in layers not to exceed six (6) inches (loose measure) in thickness and at the optimum moisture content for compaction by the equipment used, as determined by the contracting officer. The contractor may be required to add water or to allow the material to dry-before compacting. When moisture content and condition of the spread material are satisfactory to the contracting officer, the material shall be rolled with an approved type, tractor drawn, sheeps-foot roller until compacted to a density equivalent to that of adjacent undisturbed subgrade material. The compaction operation shall in no case consist of less than six (6) passes of the tractor and roller unit on each square foot of each layer. In areas not accessible to power equipment, the compacting may be done by other methods whieh will provide equivalent compaction and achieve the required density if approved by the contracting officer.
It will be observed that the first part of the paragraph applies to the use of base course material in the fills, and it would seem that the last part relates to earth fills. The seventh sentence begins, “compacted earth fills shall be constructed.” The rest of the paragraph seems to relate only to earth fills, although this is not necessarily so. Earth could not successfully be used in a fill if it was laid on soggy ground, but there would seem to be no reason for prohibiting a contractor from laying crushed stone on soggy ground if he wished to do so. If some of it sunk into the mud, he could still get a good fill by laying more stone on top of it. On the other hand, it is to be doubted that the contracting officer would have permitted the laying of crushed stone on frozen ground.
Plaintiff, however, evidently did not think while it was laying the base course that the laying of crushed stone on soggy ground was contrary to the contract requirements, *329 because it either did so voluntarily or did not protest against being required to do so.
There is sharp controversy as to whether or not the def und-ent ever required plaintiff to place the base course material on soggy ground. The weight of the evidenbe is that the defendant did not do so directly, but defendant did continually urge plaintiff to speed up the work, and this could not have been done except by placing the base course material on soggy ground, since the drainage plaintiff had installed had proved inadequate.
But even if defendant had given plaintiff a direct command to place this material on this soggy ground, and even if this was in violation of the contract, there is no proof that plaintiff registered any protest against doing so. In the absence of a protest, we do not think plaintiff is entitled to recover. Whenever the defendant orders work done which the plaintiff thinks is in violation of the contract, or in addition to its requirements, plaintiff is required to protest against doing it, or to secure an order in writing before doing it. It is basic in all Government contracts that the plaintiff cannot do work which it is not required to do by the contract, without registering a protest against being required to do it, or securing an order for extra work, and then later make a claim against the Government for additional compensation.
If the plaintiff thought that an unforeseen condition had been encountered which necessitated revision of the contract, it was its duty to call that situation to the attention of the contracting officer, so that he could investigate the condition and make an equitable adjustment in the contract, in case the conditions warranted it. Or, if plaintiff claimed that the contract had been changed in a way which increased the cost of doing the work, it was necessary for it to make claim therefor in order that the contracting officer might make an equitable adjustment. If the plaintiff claimed that extra work was being required of it, the contract expressly provided that it is not entitled to compensation therefor, unless the extra work is ordered in writing by the contracting officer and the price stated in the order. All of these requirements are for the purpose of protecting the Government against having to pay more than it committed itself to pay *330 when the contract was signed, unless authorized by an officer authorized to contract for it. Contracting officers are rarely on the ground where the work is going on, and the Government by these provisions undertook to protect itself against claims for additional compensation because of an act of a subordinate of the contracting officer, which required something to be done not called for by the contract.
Plaintiff never protested against placing this base course material on this wet ground, and for this reason we think it is not entitled to recover.
Plaintiff may have been led not to protest against placing this material on soggy ground, because its monthly vouchers for the materials placed in the base course were paid in full when presented, and it was not until after the contract had been completed and the materials in the base course had been measured for final payment that it was required to accept a deduction of a portion of the amount that had been paid to it. However, we do not think even this factor excuses plaintiff from having failed to protest against placing this material on wet ground. The contract expressly provided that payment for the base course would be measured between the subgrade line and the top of the base course. Plaintiff knew this, and, therefore, knew that any material that sunk below the sub-grade line might not be paid for. Hence, if the condition of the ground was such that it was reasonable to suppose that some of the material would sink below the subgrade line, it was its duty to protest against being required to place it on such ground, if it was of the opinion that the contract did not require it to do so. (That it did not protest indicates it was not of this opinion.)
We do not think plaintiff is entitled to recover on this cause of action, although we have arrived at this conclusion with much hesitation, because plaintiff has been paid for only some 46,000 cubic yards of base course material, whereas it actually placed about 59,000 cubic yards.
CAUSES OK ACTION NOS. 2 AND 3
Plaintiff was required to remove 1,351.9 cubic yards of base course material from one area, and 364.47 cubic yards from another area, and to replace it with other base course *331 material. It sues for the cost of excavating this material and replacing it with other base course material at the unit prices set out in the contract.
We do not think it is entitled to recover on either of these two causes of action, because it is undisputed that mud had oozed up into the base course material in these two areas, making it entirely unsuitable as a base course. When the defendant discovered this, it ordered it removed, as it was entitled to do under article 6 of the contract, giving the Government the right to reject defective material and workmanship and require its correction.
Furthermore, when the plaintiff made demand for payment for the material removed from one of these areas, the contracting officer ruled against it, holding that he was entitled to demand that this base course material, which had been impregnated with clay, should be removed. From this ruling plaintiff took no exception or appeal. For this additional reason plaintiff is not entitled to recover on these causes of action.
CAUSE OP ACTION NO. 4
In this claim plaintiff seeks to recover $11,077.09, alleged to represent increased costs incurred by plaintiff subsequent to December 2,1943, the original completion date of the contract, because of delays caused by defendant. The contract work was completed on February 19, 1944, some 79 days after the scheduled date.
Plaintiff began operations in priority area No. 1 on September 21,1943. Thereafter plaintiff encountered a number of unforeseen conditions and defendant ordered a number of changes and extra work. In two instances, defendant unreasonably delayed plaintiff in changing the contract. As to all other modifications, resulting from changes or otherwise, defendant authorized and directed plaintiff to proceed with reasonable promptness, and issued modifications equitably compensating plaintiff for additional costs;
The possibility of changes and delays necessarily incident thereto was in the contemplation of the. parties, or should have been. Defendant reserved, by articles 3 and 4 of the *332 contract, the right to make changes, and by article 5 of the contract the right to order extra work. For any necessary delays resulting from the exercise by the Government of some reserved right, there is no liability. Stafford v. United States, 109 C. Cls. 479; Parish v. United States 120 C. Cls. 100, and numerous other cases.
There is, however, an implied obligation on the part of the United States not to cause unreasonable delay in making permitted changes in the contract, for the breach of which plaintiff is entitled to recover whatever damages it has suffered thereby. See, among others, William Eisenberg & Sons v. United States, 110 C. Cls. 388. Defendant has breached this implied obligation in two instances in this case.
Plaintiff was unreasonably delayed a total of 15 days in priority area No. 3 while consideration was being given to the type of steam tunnel to be installed.
The Government had surveyed this tunnel on September 24,1943, and had decided that the wooden closure should be replaced by a concrete one and asked plaintiff to submit a proposal for doing the work. This plaintiff did, but a week later the Government changed its mind, furnished plaintiff revised plans, and asked for another proposal. This was submitted and work finally started on October 26. It was thus over a month between the time this tunnel was surveyed by the Government and the time the plaintiff was able to proceed. It was 24 days after plaintiff ran into the tunnel in its grading operations before it could proceed again. This was an unreasonable delay, to the extent of 15 days at least.
It was granted an extension of time of 15 days and an increase in price of approximately $15,000 for the additional work required, but it has not been compensated for its excess costs incident to the delay. This it is entitled to recover. It is entitled to recover this, notwithstanding the fact that it accepted the extension of time and the $15,000 for the cost of the additional work without reserving the right to sue for the excess cost incident to the delay. The delay was a breach of contract. The amount paid was not in satisfaction of damages for the breach of the contract, nor was the extension of time given.
*333 Plaintiff was also unreasonably delayed 29 days in connection with the installation of the 6-inch water main running along the west side of buildings 119, T20,123,124 and 133 of the warehouse area. The existing water main in this area did not appear on the contract drawings, but on November 2, after it was discovered, the defendant took elevations of the main, and after some discussion finally determined to install a new water line at a lower elevation. It was not until December 7, 1943, that plaintiff was ordered to proceed with the installation of the new water main. In the meantime, work was held up in the area. The contracting officer recognized that plaintiff had been delayed 29 days incident to the installation of this waterline, and granted an extension for such time.
We think the delay during the period from November 2 to December 7, 1943, was unreasonable and that plaintiff is entitled to recover its excess cost incident to 29 days of the delay. Plaintiff was paid $4,000 for the installation of this new main, but it has not been compensated for its increased cost resulting from the unreasonable delay in determining what to do. This, as in the case of the 15-day delay, was a breach of contract for which plaintiff is entitled to recover.
In this case plaintiff accepted the $4,000 “without prejudice or any claim for increased costs resulting from delays in performance”; but, independent of this reservation, we think plaintiff is entitled to recover, because this was a breach of contract.
We have carefully considered plaintiff’s other claims for delay, but we think they are without merit. There were other delays, it is true, but such of them as were caused by defendant were not breaches of the contract. The facts with reference to them are set out in findings 41 to 56.
For the 44 days which we have found plaintiff was unreasonably delayed, it is entitled to recover its excess costs consisting of $7,331.31 for the cost of mixing, placing, and curing concrete; $3,792.36 for overhead and supervision; $7,707.04 for equipment cost; and $3,062.28 for loss of efficiency due to having to perform the concrete work in cold *334 weather, or a total of $21,892.99. Judgment for this amount will be entered for plaintiff against defendant.
Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Currell Yance, and the briefs and argument of counsel, as follows:
1. Plaintiff, J. A. Eoss & Company, is and at all times mentioned herein was a corporation duly organized under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois. In this suit plaintiff is seeking recovery of $111,331.46 in connection with the provisions of the contract as hereinafter set forth.
2. On September 14,1943, defendant, acting through Major Charles T. Bishop of the Corps of Engineers as contracting officer, entered into a contract with plaintiff whereby the latter agreed to furnish all labor, plant, and material and perform all work necessary for the placement of concrete pavement and hard standings, the installation of sewer pipes, manholes, catch basins, and junction chambers for surface drainage, and additional railroad trackage. The site of the work was to be the Erie Proving Ground, LaCarne, Ohio, located between Toledo and Sandusky, Ohio. The work was to be performed in various designated areas within a range of approximately one and one-half miles.
The contract contained 59 separate items of work with approximate quantities having a contract value of $712,153 based upon unit prices contained therein. This amount was increased by modifications in the net amount of $60,532.78. Plaintiff was awarded $2,520.25 for calcium chloride used in curing concrete by the Army Board of Contract Appeals. Plaintiff has been paid $775,206.03 for work performed under the contract.
3. The contract provided that work should be begun within five days after receipt by the contractor of notice to proceed, and that it should be completed on or before December 2, 1943. Notice to proceed was issued and received by plaintiff *335 September 14, 1943, designating that work commence on or before September 20, 1943. The contract contained no provision for the assessment of liquidated damages for failure to complete the work by the date specified.
The completion date was extended by Modification No. 3 to December 17, 1943, on account of unforeseeable causes beyond the control and without the fault or negligence of the contractor, namely, negotiations on account of tunnel to be installed. The completion date was further extended from December 17,1943, to January 15,1944, by Modification No. 6, covering extra work. The completion date was again extended by Modification No. 15 for a period of 237 calendar days to September 8, 1944, due to causes beyond the contractor’s control and without its fault or negligence.
All work, with the exception of minor items, was completed on or about February 19,1944. The extension to September 1944 was to allow the contractor to replace certain damaged paving during the summertime.
4. Paragraph 1-01 (b) of the specifications required that prior to the submission of an offer the offeror should visit the site of the work and acquaint himself with all local conditions. Paragraph 2-07 of the specifications stated that prospective offerors were expected to examine the site of the work and determine the character of foundation materials, existing grades, ground surface, and other physical data, and make their offers accordingly.
On August 27, 1943. plaintiff’s general superintendent, Ealph W. Petrie, visited the site of the work for the purpose of gathering data for submitting a proposal on the contract work. He was furnished a set of contract drawings, and was conducted over the entire site of the project by Captain Charles W. Forbes, who was to be the assistant to the contracting officer on the project.
Mr. Petrie observed that the entire project site was fairly level, and learned what would be the intended use of the completed areas in which work was to be performed under the contract. He observed that there was no open drainage system in the area, other than an open ditch northeast of priority area No. 1. He inquired as to whether there was any drainage tile in the areas in which contract work was to *336 be performed, and whether any test borings had been made. Captain Forbes told Mr. Petrie that he did not think any test borings had been made, and that he did not know whether or not there was any drainage tile in the areas. Mr. Petrie made no inquiries as to existing underground utilities.
Thereafter the information gathered was transmitted to plaintiff and a bid was computed and made on the contract work.
5. The original contract provided for the payment of approximate quantities for the following items:
1. Excavation_ 60,000 cu. yds. at $0.55
2. Base course_ 40,000 cu. yds. at 2.73
3. Concrete paving_ 143,000 sq. yds. at 2.41
4. Crushed stone surfacing 76,000 sq. yds. at. . 68
No provision was made for payment of any fill that might be required to bring up the subgrade to the specified lines and elevation for placing of the base course.
A supplemental agreement dated September 15,1943, and negotiated concurrently with the plaintiff’s bid on the original contract, was designated as Modification 1, and provided, in part:
In order to allow the Government more latitude in the selection of materials for construction of the base course for the pavement and hard standings, certain changes and additions are made to the contract specifications.
* #• # * *
The contract price as set forth in the principal contract is hereby increased in an estimated amount of Two Thousand Five Hundred and no/100 ($2,500.00) Dollars as follows:

It was contemplated that the compacted fill would be required largely in priority area No. 1. The changes in the specifications made by this modification are set forth in finding 8.
6. Section II. General Conditions of the specifications, provided in part:
*337 2-03. ORDER op work. The work shall be carried on at such places and in such order of precedence as may be found necessary by the contracting officer, and shall be constructed in every part in exact conformity with the location and limit marks, which will be indicated by stakes, lines, marks or otherwise.
By letter dated September 14,1943, the contracting officer forwarded to plaintiff a letter from the Post Engineer, Erie Proving Grounds. The Post Engineer’s letter contained a list of areas (a, b, c, and d) designated for priority in the performance of concrete paving, with other areas to follow or be performed concurrently. The contracting officer suggested that in developing organization and ascertaining equipment needs the list be given every consideration.
In the performance of the work, and in references throughout the testimony, evidence, and findings herein, designated priority areas and other principal areas of work have been referred to in numerical order, but not in the same sequence as that specified in the letter to plaintiff of September 14,1943. The numerical areas of priority performance, as used herein, are set forth below, together with the letter designation of such areas in the letter to plaintiff of September 14.

In addition to the designated priority areas, concrete pavement was specified in strips between buildings 118 to 126, inclusive, and 133, referred to as the warehouse area. Most *338 of the area between these buildings was specified for crushed stone surfacing, as well as a long strip along the west side of building 160, extending north to area No. 2. Other smaller areas throughout the project were designated for concrete pavement or stone surfacing.
CAUSE OP ACTION NO. 1
7. This claim is for the payment of an additional 12,683.02 cubic yards of compacted base course material, at the contract price of $2.73 per cubic yard, or the sum of $34,624.64.
The plaintiff placed and was paid for 140,583.45 square yards of concrete pavement, and 75,980.96 square yards of crushed stone surfacing or macadam hardstanding, making a total of 216,564.41 square yards of paving. The contract called for the placing of a base course of compacted stone or slag under both the concrete and the hardstandings.
The plaintiff purchased 104,146.25 tons of crushed stone of the type and gradation specified for the base course. It sold 1,824.15 tons to subcontractors for use around catch basins, and other purposes. The remaining 102,322.1 tons represent 60,367.02 cubic yards, at a properly determined conversion factor of 1.695 tons for each cubic yard of compacted base in place.
The plaintiff wasted 1,716.37 cubic yards by its removal and replacing of a like quantity in priority areas 1 and 5, after it became mixed with mud and was found unsuitable as a base under the concrete pavement. This material is the subject of additional claims under causes of action 2 and 3. The remaining 58,650.65 cubic yards were placed within the specified lines and grades of the base course or in the fill immediately below such lines and grades as surveyed.
The plaintiff was paid for 46,132.08 cubic yards of base course. It placed 12,518.57 cubic yards in excess of the quantity paid for. At the contract price of $2.73 for base course the value of 12,518.57 cubic yards is $34,175.70.
8. The contract provided, as stated above, for the spreading of a base course upon a prepared subgrade at a price of $2.73 per cubic yard. The specifications, as modified by the supplemental agreement referred to in finding 5, provided in part:
*339 SECTION m — earthwork and base course
3-01. General. The work covered by this section consists of furnishing all labor, materials and equipment and performing all operations necessary to complete the excavation; preparation of subgrade and construction of base courses, for roads, paved areas, railroads and ditches, all as indicated on the drawings, as hereinafter specified, and as directed by the contracting officer.
3-02. Excavation and grading.
(a) Excavation. The subgrade under surface areas and railroads shall be excavated to the depths indicated on the drawings, or to such additional depths as may be directed by the contracting officer to provide a reasonably firm foundation. Material removed shall be disposed of in areas indicated on the drawings or designated by the contracting officer.
(b) Gradmg.[1] Grading operations in areas where no excavation is required shall be as directed by the contracting officer. No over-all stripping is contemplated but grading shall be sufficient to provide an adequate foundation. Fills shall be constructed of base course material in all areas where the required fill is six (6) inches or less in depth. Where the total thickness of base course and fill exceeds eight (8) inches the material shall be placed in courses not to exceed six (6) inches in depth. Placing and rolling shall be in accordance with the requirements of paragraph 3-03 (c). In areas where the required fill is greater than six (6) inches in depth the fill shall be constructed of base course material or compacted earth as directed by the contracting officer. Compacted earth fills shall be constructed with material obtained from excavation or borrow which has been approved by the contracting officer for that use. Areas to be filled shall be stripped of unsuitable material as directed and loosened by scarifying sufficiently to provide a bond with material placed for the fill and shall be dampened if required. Fill shall not be placed in areas where the surface material is frozen or wet. Material to form the earth fill shall be placed in layers not to exceed six (6) inches (loose measure) in thickness and at the optimum moisture content for compaction by the equipment used, as determined by the contracting officer. The contractor may be required to add water or to allow the material to dry before compacting. When moisture content and condi *340 tion of tbe spread material are satisfactory to the contracting officer, the material shall be rolled with an approved type, tractor drawn, sheeps-foot roller until compacted to a density equivalent to that of adjacent undisturbed subgrade material. The compaction operation shall in no case consist of less than six (6) passes of the tractor and roller unit on each square foot of each layer. In areas not accessible to power equipment, the compacting may be done by other methods which will provide equivalent compaction and achieve the required density if approved by the contracting officer.
(c) Preparation of subgrade. The subgrade shall be shaped to the lines, grades and sections indicated on the drawings or designated by the contracting officer, using a blade grader or other approved equipment. Use of the prepared subgrade by trucks or other equipment shall be avoided as much as possible.
8-03. Base cottRse. * * *
(b) Insulation course. Material for the insulation course shall be spread on the prepared subgrade to a depth of approximately one inch and shall be shaped to fit the subgrade but not rolled. The thickness of the insulation course shall be considered part of the finished base course.
(c) Base course. Material for the base course shall be placed and spread, without segregation of size, to such depth that, when shaped and compacted, the surface will conform to the grades indicated on the drawings and established by the contracting officer. Spreading shall be from moving vehicles equipped to distribute the material in a uniform layer or by other methods approved by the contracting officer. The spread material shall be rolled with a power roller weighing not less than ten (10) tons until satisfactory compaction has been obtained. The surface shall be choked with limestone screenings and/or sprinkled during the final stages of rolling if necessary to produce a tight, dense surface.
(d) Final grading. The surface of the base course shall be maintained in a smooth, compact condition until the concrete or crushed stone surfacing is placed. Immediately before placing the surfacing the surface of the base course shall be tested with a ten (10) foot straight edge, and any deviation in excess of three-eighths (.%) inch shall be corrected by loosening the material, adding or removing material, and reshaping and re-rolling as specified above.
*341 3-04. MEASUREMENT.
(a) Excavation. Measurement of excavation for roads, paved areas, railroads and ditches will be based on the volume, in cubic yards, of material removed, measured in its original position between cross sections and profiles determined prior to the starting of the work and lines, grades, and excavation limits established by the contracting officer. Quantities will be computed by the average end area method without prismoidal correction. No measurement will be made of excavation for sewers, subdrains, water lines and appurtenances.
(b) Base course. Measurement will be based on the volume of material in cubic yards, placed in the insulation and base courses, measured between lines and grades established for the subgrade and lines and grades established for the base course. Quantities will be computed by the average end area method without prismoidal correction.
(c)[2] Oompaction of earth fill. Measurement will be based upon the volume of material, in cubic yards, placed and compacted in earth fills, measured between lines, grades and limits established for grading operations and lines and grades established for the base course. Quantities will be computed by the average end area method without prismoidal correction.
3-05. Payment. * * *
(b) Base course. Payment will be made at the contract unit price specified in the Offer Schedule. Item No. 2, which payment shall constitute full compensation for furnishing, placing and spreading the material for the insulation course; furnishing, placing, spreading and compacting the material for the base course, and furnishing all labor, equipment, tools and incidentals necessary to complete the item.
The insulation course was to consist of a gradation of crushed limestone or slag up to a maximum size that would pass through a one-half inch sieve, and the base course required graded materials up to sizes that would pass through a 3-inch sieve.
9. Contract drawings show typical paving sections which provided 5 inches of base course under the concrete pavement and 8 inches of base course under the crushed stone paving. The minimum requirement for 140,583.45 square yards of *342 concrete and 75,980.96 square yards of crushed stone paving would be 36,410.14 cubic yards of base course. By including the 1-inch insulation course that was to be included in the base course measurement, the required base course, exclusive of base course material used as fill, would be 42,425.82 cubic yards.
Soon after the construction commenced, the insulation course was eliminated. Thereafter only the one class of base course material was used. The required base course was not increased by the additional inch depth specified for the insulation course. The required depth of the base course under the crushed stone paving was reduced from 8 inches to 6 inches. There was no change order or modification issued for these changes in the specifications and drawings.
The quantity of base course material required for 5 inches under the concrete pavement and 6 inches under the crushed stone paving was 32,188.2 cubic yards.
The 46,132.08 cubic yards of base course paid for is 13,-943.88 cubic yards in excess of the minimum base course required, and was computed upon cross-section measurements by the defendant’s survey parties made currently upon approved subgrade lines and grades, and lines and grades established for the base course. The final computations were not prepared, nor quantities determined until long after the work had been completed. There is no pleading or proof that the measurements were erroneous.
10. The specifications as modified by Supplemental Agreement No. 1 provided that fill should be constructed of base course material in all areas where the required fill was 6 inches or less in depth, and of base course material or compacted earth as directed by the. contracting officer, in all areas where the required fill was greater than 6 inches in depth. The evidence does not establish the amount of base course material used as fill.
The base course material was placed upon subgrades approved by Government representatives. The elevations were not always in accordance with the original lines and grades established in the contract drawings. In a few instances the muddy subgrade was removed upon the direction of Government representatives and additional fill was made *343 with base course materials, but these areas were recross-sectioned and the quantity was included in the yardage paid for.
11. Weather conditions during the early part of the contract work were excellent. Plaintiff experienced little or no difficulty due to weather prior to October 13, 1943. Weather Bureau reports for Toledo, Ohio, about thirty miles from the Proving Ground, and for Sandusky, Ohio, about sixteen miles from the Proving Ground, indicate that during the period from October 13 to November 16, 1943, rain fell on 27 days. The Proving Ground is located between Toledo and Sandusky, and it is reasonable to assume that rainfall in the area was general. Though rainfall was frequent, it was not particularly heavy in amount, 2.83 inches being recorded at Sandusky and 3.50 inches being recorded at Toledo. Total rainfall for the months of September, October, and November was below normal for the area.
12. The subgrade in the project area was of a clay soil, and during the period of frequent rains it became wet and soupy. During this period, the contracting officer and his representatives were continually urging plaintiff to expedite the work. The evidence is conflicting, but it does not establish that plaintiff was specifically instructed by defendant to place base course material on wet and soupy subgrade. Defendant’s representatives interpreted the contract specifications as not prohibiting this practice, however, and in view of their admitted constant efforts to push the contractor’s performance, there is no doubt that defendant’s representatives were conscious that their instructions would result in the placing of base course material on wet and soupy subgrades.
13. Prior to the award of the contract to plaintiff, the project site was being operated as an Ordnance Department post. There were a number of buildings, railroads, roads, and other installations in the area, and post functions were going on in the areas where contract work was to be performed by plaintiff. No part of the project contained any subdrainage. The existing drainage on the post consisted of storm sewers in areas other than those requiring paving under the plaintiff’s contract, open ditch drains along existing roads and a large open ditch extending beyond the eastern side and northeast of priority area No. 1, inside of Camp Perry Keservation.
*344 The elevation of the entire project was only a few feet above the water level of Lake Erie, but the plaintiff experienced very little difficulty with subterranean water. The plaintiff’s contract called for the construction of additional open ditches and the installation of approximately 21,000 linear feet of sewer pipe for surface drainage, varying in sizes from 8 inches up to 54 inches in diameter. It also required approximately 95 additional catch basins and catch basin manholes, and 32 other types of manholes.
The contract (item 30) also called for the installation of approximately 910 linear feet of 6-inch perforated pipes for subdrainage. Six-inch perforated pipes were also required in portions of the sewer drain trenches, specified as double drains, amounting in all to between 2,000 and 3,000 linear feet. These subdrain pipes were perforated only on one side, or half around. They were placed not more than 2 feet deep, with the perforated side up, and on a grade of not less than 0.2 percent. They were placed around building No. 160, where crushed stone surfacing was specified. None was designated in areas for concrete paving.
There were sewer lines to be laid under approximately 60 percent of the areas to be paved by plaintiff.
14. The sewer pipes constituted two major systems for surface drainage. The eastern system was designed to drain priority areas 1, 3 and 4 for concrete pavement and to concentrate the water into a 48-inch main which discharged into the existing open ditch to the east and outside of the Proving Grounds. All of the other principal areas of construction were designed for drainage into a large wet well immediately north of building 160, where a pumping station was designated for construction under a future contract.
The accumulation of water in the constructed well was to be pumped through a 42-inch force main, which was to extend from the pumping station toward the northwest across plaintiff’s pavement area No. 2 and to be discharged into a canal outside of the construction area. The 42-inch force main was not shown on the plaintiff’s contract drawings. Neither the pumping station nor the 42-inch force main, which was also awarded to another contractor, were completed until after the plaintiff’s work had been finished.
*345 The sewer pipes specified were the bell and spigot type, constructed of vitrified clay, non-reinforced concrete or reinforced concrete. The joints were to be packed with a gasket and completely sealed with cement mortar or a bituminous compound. They were placed from three to six feet deep. They were designed as storm sewers for surface drainage after the pavement had been completed, and would admit water only through the grating or grill inset which was approximately flush with the finished pavement.
15. The larger areas requiring concrete pavement were from 300 to 400 feet wide and 600 to 800 feet long. The proposed sewer pipes generally ran along the central portions of the pavement areas. The catch basin grills or openings were at the approximate level of the finished pavement, and projected about one foot above the prepared subgrade elevation.
The finished pavement sloped generally from the outer edges toward the center where catch basins were installed, with varying gradients. Although there is a conflict in the testimony, the evidence establishes that the finished pavement areas drained satisfactorily following the completion of the contract work.
The work specified and performed under plaintiff’s contract was urgent and required for immediate use in the war effort.
The contracting officer’s representatives on the job insisted upon production and more production. Discussions were had with plaintiff’s representative almost every day that it rained to have the water cleared off the subgrade. The contracting officer phoned the superintendent of plaintiff’s subcontractor for hauling crushed stone, almost every night and requested more equipment be employed and more stone be delivered for the base course.
The work could not have been completed in the contract period unless base course material was placed upon wet sub-grades. Government representatives insisted upon the delivery and placing of base course material by plaintiff in order that paving could proceed with knowledge that their efforts would result in the placing of base course on wet and muddy subgrades. The provision of the specifications pro *346 hibiting the placement of fill on frozen or wet surface materials was not considered applicable to any of the crushed stone base course material so long as proper compaction of the base course was obtained.
16. The subgrade and the base course were prepared with approximately the same grade level as the finished pavement. The subgrade was composed chiefly of clay. It was very hard when dry, but became soft and plastic when wet. It absorbed and retained water readily, requiring several days to dry out after a normal rainfall. The project site was fairly level prior to the commencement of contract operations, and the areas to be paved were too flat for natural drainage.
During the period of frequent rains referred to in finding-11, surface water accumulated on the subgrade in various areas. As stated in finding 15, the contracting officer and his representatives made repeated efforts to get the plaintiff to take steps to drain the subgrade properly. Plaintiff did endeavor to clear the surface water by the use of trenches' and sumps, and it employed portable pumps and tank wagons to remove water from the construction areas. The evidence establishes that plaintiff did not have sufficient laborers or adequate equipment to clear the water off the subgrades in the paving areas, and that plaintiff’s efforts in this endeavor were deficient.
Surface drainage of the subgrade could not be completely effected by the use of trenches and sumps. Water would not drain into ditches and sumps from the subgrade, because of the flatness of the areas, and because of the capacity of the clay subgrade to absorb and retain water.
17!. The plaintiff’s subcontractor for hauling crushed stone for the base course employed semi-trailers, which delivered 18 or 19 tons, and were designed to spread the material over the prepared subgrade. Material was delivered sometimes upon wet and soggy areas that had water standing on the surface. The equipment became bogged down, and in some instances had to be pulled out with other tractors. When the equipment was unable to get in and out of the areas, the materials were stockpiled and later spread by a bulldozer; although it is customary to spread the material directly *347 upon prepared subgrade. On one occasion the Government’s chief inspector stopped the spreading of base material by a bulldozer because of the unsuitable condition of the subgrade.
18. The specifications did not require any compaction of the subgrade except in those areas where fill was required. In areas where fill was required, the material was to be rolled with a tractor-drawn sheepsfoot roller until compacted to a density equivalent to that of adjacent undisturbed subgrade material. The principal area requiring fill was priority area No. 1, where the ground elevation was low, and where considerable excavation was performed to remove muck, steel scrap from an old dump area, and other unsuitable material.
The specifications required that the base course should be rolled with a power roller weighing not less than ten tons until satisfactory compaction was obtained.
19. The finished pavement was intended for use in moving and storing ordnance, artillery, and equipment weighing from 2 to 30 tons. The plaintiff contends that the 6-inch surface pavement and the base course specified were inadequate considering the loads the base course had to carry during contract operations and the loads to which the finished pavement would be subjected.
The evidence is insufficient to establish that the defendant’s project design was faulty or defective in this respect. The areas paved by plaintiff under the contract have been used as a proving ground for the moving and storage of ordnance, artillery, and equipment since completion, and have required only routine annual maintenance.
20. The 46,132.08 cubic yards of base course material for which plaintiff has been paid represents an average placement of 7.6686 inches under all paved areas. The 58,650.65 cubic yards of base course material which plaintiff delivered and placed represents an equivalent of 9.7496 inches of compacted material under all paved areas.
A large portion of the 12,518.57 cubic yards of base course material placed by plaintiff, but for which it has not been paid, was depressed into the soft clay subgrade in the process of achieving compaction of the base course in accordance with contract specifications, and by the operation of heavy *348 equipment used in placing and spreading the base course and pavement. As a result of this depression, defendant actually acquired a base course averaging approximately 9% inches of crushed stone, instead of 7% inches calculated and paid for upon, cross-section measurements of the prepared subgrade.
If the subgrade upon which the base course was placed had been in proper shape to receive it, a loss of 5 per cent of the base course material paid for, or 2,306.60 cubic yards, into the subgrade would have been normal.
21. Within recent months the plaintiff, with the permission of the defendant, has caused a number of test holes to be put down over the entire work area of the contract, and the depth of the base coúrse material measured at such representative locations. These tests show base course in place in concrete pavement areas varying in depth from 0.32 feet to 1.72 feet, and in crushed stone surfacing areas of from 0.48 feet to 1.51 feet. A computation of the total quantity of base course, based on such measurements, shows a total cubic yardage actually in place of approximately the amount claimed by plaintiff herein.
22. Plaintiff contends that but for the discovery and correction of a number of subsurface conditions not shown on the plans and specifications, the stone base course work could have been completed and the pavement placed thereon prior to the rainy season.
Plaintiff had planned to have 20 per cent of the base course work completed by October 9, 1943, and 40 per cent of this work completed by October 16, 1943. Concrete pavement operations were to be commenced between October 9 and October 16, with an anticipated completion of 10 per cent by October 16. Comparable figures with regard to crushed stone surfacing show 5 per cent expected completion by October 9, and 20 per cent by October 16. The rainy season began on October 13, 1943, as indicated in finding 11.
As shown by the findings under plaintiff’s fourth cause of action herein, plaintiff was delayed to some extent in the placing of base course and paving by the subsurface conditions, but there is no proof as to what effect such delays had upon the amount of base course material which sank into the *349 subgrade. Plaintiff would have been unable to complete any of the base course or paving work prior to the rainy season even had the work progressed as rapidly as had been anticipated.
23. On October 7,1944, plaintiff signed a qualified release in which it reserved its claim on this item and the items involved in the other causes of action in this suit.
24. Plaintiff filed its claim on this item with the contracting officer by letter of July 20,1944. Under date of November 10, 1944, the contracting officer denied the claim in writing on the ground that plaintiff had been paid for base course in the manner provided by the contract, after measurement as provided in a certain agreement in conference between representatives of the contractor and the defendant, and recorded in letter of Government to the contractor of September 25,1943, referred to and quoted in the decision of the contracting officer.
25. On November 28,1944, plaintiff appealed the decision of the contracting officer to the Secretary of War. The contracting officer thereafter made findings of fact on the claim which were transmitted to plaintiff by letter dated September 8, 1945, and to the Army Board of Contract Appeals as the duly authorized representative of the Secretary of War. Plaintiff submitted a reply to the contracting officer’s findings of fact to the Secretary of War by letter of October 5, 1945, and the contracting officer subsequently made an undated report on the contractor’s reply to the findings.
26. The Army Board of Contract Appeals denied plaintiff’s appeal on September 19, 1947. The Board’s decision stated, in part:
In this appeal the appellant seeks payment for 12,683.02 cubic yards of base course material which it alleged was delivered to and used in the project but which upon compaction was forced into the mud below the subgrade and as a result was not included in the measurement for payment. * * * The appellant herein bases its claim on two grounds, (1) that the rainfall and the wet subsurface constituted changed conditions under Article 4 of the contract, and, (2) that the representatives of the Government caused a change in the specifications by directing that the *350 base course material be placed on a wet subgrade. * * * It is quite obvious from the records of the Weather Bureau * * * that the rainfall during any particular period of the contract term was not of such a nature as to qualify as a changed condition. * * * water in the subsurface did not constitute a changed condition. * * * The appellant failed to show that any representative of the Government specifically ordered it to place any base course material on wet subgrade but endeavored to show the same result by the acts of Government representatives under the existing circumstances. * * * The appellant did not cafl the Board’s attention to any specific conduct of Government representatives * * * which might serve as a basis for finding by this Board that the appellant was directed to place the base course on wet subgrade. The appellant made certain general allegations to that effect but sufficient facts were not presented to justify such a finding by this Board. * * * In this appeal the method of measurement used was in accordance with the provisions of the contract. The parties realized that upon compaction a certain amount of base course material would be forced into the subgrade beyond the lines for measurement. The appellant had control of the amount of such loss by its supervision of the placement subject to the terms of its contract and the risks inherent in the nature of the work. After reviewing all the evidence presented, the Board is of the opinion that the appellant has been paid the full amount due to it under the contract for base course material. This appeal should be denied, and it is so ordered.
CAUSES OP ACTION NOS. 2 AND 3
27. Plaintiff was ordered by the defendant to remove 1,351.9 cubic yards of base course material from a certain area and 364.47 cubic yards from another area, and to replace the same with additional base course. Plaintiff complied with defendant’s demands and has not been reimbursed.
The plaintiff claims $5,629.73, which it computed at 55 cents a cubic yard as excavation of this material under item 1 of its contract performance schedule, and $2.73 a cubic yard for the replacement of a like quantity of base course under item 2 of this schedule.
*351 28. The contract and specifications provided, in part, as follows:
Article 6. Inspection, (a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. * * *
Article 10. Permits and responsibility for work. The Contractor shall without additional expense to the Government, obtain all required licenses and permits and be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work and shall be responsible for all material delivered and work performed until completion and final acceptance. Upon completion of the contract the work shall be delivered complete and undamaged.
2-20. PROTECTION of material and work. The contractor shall, at all times, carefully and properly protect all materials of every description, both before and after being used in the work, and all work performed by him, and provide any enclosing or special protections from weather deemed necessary by the contracting officer, without additional cost to the United States. Payments under the contract will not relieve the contractor from responsibility. The contractor shall keep the buildings and grounds reasonably clean and sanitary to the satisfaction of the contracting officer. When materials and work at the site, which have been partly paid for are not adequately protected by the contractor, such materials may be protected by the United States, at the expense of the contractor.
2-22'. Liability for damages. — (a) Damutge to Government or private property. Damage to Government property, due to failure of the contractor to take reasonable precaution, and all loss or deterioration of, or damage to, the permanent work by fire, accident, or exposure prior to final acceptance shall be assumed by *352 the contractor without expense to the United States. The contractor will also be held responsible for any damage done to property adjoining his operations through his neglect or other fault.
29. During the course of plaintiff’s operations it was noted by the defendant that in two small areas a portion of the base course was too saturated with mud and water for use. Defendant thereupon verbally ordered plaintiff to remove the unsuitable base course and to replace with base course which complied with contract specifications. The total quantities so removed and replaced were 1,351.9 cubic yards in Priority Area No. 1 and 364.47 cubic yards in Priority Area No. 5.
30. The unsatisfactory condition of the base course material removed from the two areas was due to the following causes:
(1) Plaintiff was delayed to some extent in preparing the fill in priority area No. 1 for the receipt of base course, due to causes beyond its control and without its fault or negligence. As stated in finding 11, rainfall in the project area was frequent during the period from October 13 to November 16,1943. Much of the base course in area No. 1 was placed during the rainy season. Plaintiff’s efforts to drain the surface water from this area were unsuccessful, as a result of which much of the base course was placed on a wet subgrade. During subsequent contract work the operation of heavy equipment over the base course placed on wet subgrade caused an infiltration of mud and water into the base course, thereby rendering portions of it unsuitable.
(2) The base course in priority area No. 5 was placed in the early part of November 1943. Concrete pavement work in this area began November 9.1943, but the drainage system was not completed, and there was a lapse of several weeks before concrete pavement work in the area was finished. During subsequent contract work the operation of heavy equipment over the base course placed during the rainy season caused an infiltration of mud and water into the base course, thereby rendering a portion of it unsuitable.
31. Plaintiff contends that but for the discovery and correction of a number of subsurface conditions not shown on the plans and specifications, the stone base course work could *353 have been completed and the concrete pavement work placed thereon in the two areas before the rainy season.
The evidence is insufficient to establish that either of the areas could have been completed prior to the rainy season had there been no undisclosed subsurface conditions, and there is no proof as to what effect any delays from such conditions had upon the base course material which became unsuitable through saturation with mud and water.
32. Plaintiff understood that it would be compensated for the removal of the base course in Priority Area No. 1, and on November 15, 1943, wrote Captain Charles Forbes, the contracting officer’s assistant, as follows:
This is to confirm our conversation of yesterday regarding the removal of unsuitable subgrade material and replacing same with stone base material east of Building No. 20. It is our understanding that this work will be paid for at the unit price as scheduled in the above-mentioned contract.
Although the testimony is conflicting, there is no satisfactory proof that plaintiff was verbally promised that it would be paid at contract unit prices for the removal and replacement of the unsuitable base course material from priority area No. 1 or priority area No. 5.
33. On December 1, 1943, Major Charles T. Bishop, the contracting officer, wrote plaintiff:
Base material placed on any subgrade that is not well drained or properly prepared to receive same whereby during construction operations mud boils result, this base material shall be removed as directed by the Contracting Officer or his representative, and no payment will be allowed for this wasted material.
Furthermore, if weather conditions produce a saturated subgrade beneath base material prior to placing of concrete pavement or hardstanding, same shall be drained and thoroughly allowed to dry. If construction operations are hastened and mud boils result due to weather, this material shall also be replaced and no additional compensation will be allowed.
Direct reference is made to the situation in the area east of Building No. 20 whereby you were directed to waste base material impregnated with clay due to a poorly drained subgrade. As stated in the preceding *354 paragraph, no additional payment will be allowed for this wasted material.
Plaintiff took no exception to or appeal from this ruling, and no written order for extra work under Article 5 was ever issued. The above ruling was made prior to the order to remove base course material from priority area No. 5.
34. Plaintiff filed claims with the contracting officer in the amount of $4,434.23 on January 3, 1944, and in the amount of $1,195.50 on February 7, 1944, for these respective items. The January 3 claim was denied by the contracting officer on February 18,1944, and the February 7 claim was denied by the contracting officer on June 21,1944. Plaintiff timely appealed the decisions of the contracting officer to the Secretary of War. Subsequently the contracting officer made findings of fact on the two claims which were transmitted to plaintiff by letters dated July 6,1944, and November 3,1944, respectively.
35. The Army Board of Contract Appeals as the duly authorized representative of the Secretary of War denied plaintiff’s appeals on the two claims. The Board found that rainfall was less than normal for the area involved during September, October, and November, notwithstanding that during a period of 30 days rainfall was frequent, though not particularly heavy in amount, and that subsurface water was not such a material cause of the wet subgrade as to constitute a changed condition under Article 4 of the contract. It found that while there was a distinct conflict of testimony as to the adequacy of the specifications for the project, the evidence was insufficient to show that the design was faulty, inadequate, or improper, that factors other than the inherent inadequacy of the specifications caused the base course to become muddy and unsatisfactory, and that had not the vehicles of the contractor traveled over the wet base course, the base course material would not have become unsuitable.
The Board also stated that the contractor was required by paragraphs 2-20 and 2-22 of the specifications to protect all work performed by it and to assume any damage to the base course from exposure prior to final acceptance of the project by the Government, and that pursuant to Article 10 of the *355 contract the contractor had the responsibility to remove and replace unsatisfactory base course material.
CAUSE OP ACTION NO. 4
36. The plaintiff here claims $71,077.09, representing increased costs resulting from alleged delays on the part of the defendant in determining changes in construction and by reason of increased quantities of work required, which projected its performance beyond the termination date of December 2, 1943, and into the period of adverse weather conditions, thereby allegedly increasing the performance costs of such work.
37. The contract provided in part as follows:
Article 3. Changes. The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required, for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered. Provided, however, that the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the Secretary of War or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
Article 4. Changed, conditions. Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately *356 to such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall with the written approval of the Secretary of War or his duly authorized representative, be modified to provide for an increase or decrease of cost and/or difference in time resulting from such conditions.
AtíttCt.tü 5. Extras. Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
ARTICLE 9. Delays — Damages. If the contractor refuses or fails to prosecute the work, or . any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extensions thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. * * * Provided, That the right of the contractor to proceed shall not be terminated under this article because of any delays in the completion of the work due to causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to acts of God, or of the public enemy, acts of the Government (including, but not restricted to any preference, priority, or allocation order), acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes. In which event, the contracting officer shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal within 30 days, by the contractor to the Secretary of War or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
Article^ 15. Disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall *357 reduce his decision to writing and mail a copy thereof to the Contractor at his address shown herein. Within 30 days from said mailing, the Contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall he final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the Contracting Officer, or a board as his authorized representative to determine appeals under this Article. The Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. * * * Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the Contractor under the provisions of this Article shall be paid by the United States as part of the cost of the articles or work herein contracted for and shall be deemed to be within the contemplation of this contract.
38. The specifications provided in part:
SECTION H — GENERAL CONDITIONS
2-04. Prosecution oe work.
(b) If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in the delivery of materials or supplies essential to such performance because of priorities and allocations and without the fault or negligence of the contractor, the time of performance will be extended for a period equal to such delay, as determined by the contracting officer, and subject to appeal, as provided in Article 9 of the contract.
2-06. Use and intent oe drawings, specieications AND OTHER PERTINENT DATA.
(c) The work shall also conform to such other ex-' planatory drawings relating thereto as may be exhibited in the office of the contracting officer prior to the opening of offers and to such additional drawings in explanation of details or modifications as may be furnished by the contracting officer during construction, including such changes as he may consider necessary during prosecution of the work (see Articles 3 and 4 of the contract).
2-07. Physical data. The contract drawings represent all the pertinent information which the Government has available for work at the site. Prospective offerers are expected to examine the site of the work and *358 determine the character of foundation materials, existing grades, ground surface, and other physical data, and make their offers accordingly. It is expressly understood that the Government will not be responsible for any deduction, interpretation, or conclusions made by the prospective contractor from his inspection of the site, available drawings and records.
2-08. Utilities.
(b) Underground, utilities. If during the progress of the work the contractor encounters existing utilities not indicated on the drawings, he shall immediately notify the contracting officer in writing, requesting instructions prior to disturbing the utilities.
39. The plaintiff had subcontracted excavation and grading to A. J. Baltes, Inc. The laying of sewer pipes, construction of catch basins, manholes and other drainage work was subcontracted to Drainage Contractors, Inc., which, in turn sublet a portion of the sewer pipe installation to Lametti and Lametti Company. Railroad tracks and other railway installations required under the plaintiff’s contract were subcontracted to the Pierce Construction Company.
In addition to supervising all work under the contract, the plaintiff was primarily engaged in the placing and compaction of the base course, the concrete pavement and crushed stone surfacing.
Crushed stone of the types specified for the base course was purchased from The France Stone Company of Toledo, Ohio, and The Kelley Island Lime and Transport Company, of Marblehead, Ohio. Crushed stone for macadam surfacing was purchased by plaintiff from The Wagner Quarries, of Sandusky, Ohio.
Except for a small portion of crushed stone brought in by railroad cars from the East Toledo plant of The France Stone Company, the crushed stone was delivered by trucks of subcontractor Paul R. Jeffers, Inc. A large area northeast of building 160 was authorized for plaintiff’s use and was employed in part as a storage area for concrete aggregates and mixing facilities. The concrete was delivered to the paving areas by transit mixer trucks under a subcontract with the Nicholson Concrete Company of Toledo, Ohio.
No claim is made for or on behalf of any subcontractor. *359 No claim is made for any increased costs incurred prior to December 2,1943.
40. Pursuant to the order of precedence set forth in finding 6, the plaintiff’s subcontractor for excavation and grading commenced operations in priority area 1, on September 21, 1943. Drainage work was commenced September 29, 1943, and the placing of base course and concrete paving was commenced October 9, 1943.
The main grading areas were completed about the end of November 1943, and thereafter follow up grading was performed after paving had been completed. Grading was not completed until January 1944. Drainage work was completed the first week in January 1944, and the last concrete was poured January 12,1944.
Thereafter small areas of stone surfacing were placed and finish grading and clean up work was performed. The contract work was completed February 19, 1944, except for the necessary replacement of a small part of the concrete pavement that had frozen and was damaged. This remedial work was performed in June, 1944.
Because of changes and changed conditions hereinafter set forth, the order of precedence for the various construction areas was not followed and could not be progressively pursued. The work had to be performed at such times and places as were feasible under existing conditions. The small areas where no sewer work was required were paved first, and operations were shifted from one area to another as conditions required such changes.
AREA NO. 1
41. Excavation in area No. 1 had progressed less than one hour on September 22, 1943, when an undisclosed six-inch cast iron water line was struck. This line had to be lowered, and additional fittings were required. On the following day two scrapers were down seven hours with flat tires, occasioned by steel scrap which had been dumped into this area at some previous time. On September 28, the Government ordered the installation of an additional 150 feet of 24-inch sewer line from the junction manhole in the center of the area. A *360 substantial quantity of muck was discovered in this area, which had to be excavated and wasted. This required excavation deeper than was anticipated, amounting to approximately 8,000 cubic yards. Very little rainfall occurred during this early period of the work, but in excavating to the depth required, the equipment became mired in muck and water. Required fill in this area was approximately double that estimated in Modification No. 1.
Some additional time was required to obtain the water pipe fittings and additional sewer pipe. The excavation subcontractor declined to remove the steel scrap, and no equipment was available for this purpose. On September 30, 1943, the plaintiff rented a dragline from the Post Commander for removal of this steel scrap. It was first stockpiled, and then bulldozed off the area for grading and paving. After the area was paved the steel scrap was hauled into a disposal area in Camp Perry.
On February 1, 1944, plaintiff submitted its price of $2,243.58 for the removal of this steel scrap. An allowance of $1,000 was awarded for this work under Modification No. 11, January 15, 1944.
The steel scrap deposit was located along the northeast edge of this area, about 200 to 300 feet in length, 40 to 50 feet wide and as much as 6 feet deep, and was equivalent to approximately 500 cubic yards. It did not interfere with the installation of the sewer pipes and this work was continued in area No. 1 until its completion.
42. Concrete paving in this area was commenced October 20, 1943, and was completed about December 1, with the exception of open spaces for the construction of manholes, which were paved December 8, 1943. The plaintiff was delayed in placing the base course and concrete pavement by reason of increased quantities of excavation and fill and some delay in acquiring equipment and removing the steel scrap.
The additional sewer pipe was paid for under item 8 of the contract schedule of payments.
The plaintiff was paid $615 for additional paving of the transition section in this area between the old black top and new concrete pavement specified as item 5 of Modification 18. This work was performed December 19 and 20,1943.
*361 Modifications 11, 12, and 13, all dated January 15, 1944, were submitted to the plaintiff for acceptance by letter of April 28,1944. They were accepted by the plaintiff without protest, but without waiving any other claims that it might have by reasons of other items of alleged extra work or any increased costs resulting from delays in performance.
AREA NO. 3
43. Area No. 3 was located west of area No. 1 and building No. 18. Very little grading was required in this area. On October 2, 1943, when stripping was commenced in this area, the excavation subcontractor ran into the board housing of the steam tunnel which traversed the eastern part of this area.
On September 24, 1943, the Government had surveyed the elevation of this steam line. It was determined that the wooden closure should be replaced by reinforced concrete housing for this steam line, and the plaintiff was orally requested to submit a proposal on the same, which it submitted on October 8, 1943. By letter of October 15, the plaintiff was furnished a revised drawing and requested to submit a new proposal, which was submitted October 21, 1943. Other changes were made for additional manholes in the steam line tunnel in November 1943. In the meanwhile plaintiff was orally directed to proceed with the construction of the new steam tunnel, and had started some form work about October 12,1943.
Excavation for the steam tunnel footings was commenced about October 26, and the tunnel was substantially completed November 26, 1943. The new concrete steam tunnel was from 2 to 3 feet 3y2 inches inside measurements, with a plank top, and 465.5 feet in length. Plaintiff also repaired 63 feet of existing tunnel and was paid $15,439.46 for this additional work under Modification 10, dated January 15, 1944, which was submitted for its acceptance February 8, 1944, and accepted by plaintiff without qualification.
The construction of the steam tunnel required the excavation of a trench approximately 7 to 8 feet wide and 3% feet deep, the removal of the old wooden closure, and the placing of forms for the concrete slab and side walls, substantially *362 all hand labor. The redesigning and construction of this steam line tunnel substantially delayed the grading and concrete paving in area No. 3, and necessitated the shifting of operations to other areas.
Modification No. 3 was issued December 1,1943, extending the contract period by 15 calendar days on account of delays during the negotiation on the type of steam tunnel to be installed. The plaintiff accepted this modification without any qualification.
The delay of 15 days during the period of negotiations and consideration of the type of steam tunnel to be installed was unreasonable, and projected the ultimate completion of the contract work for a period approximately equivalent to the time extension granted plaintiff by Modification No. 3.
44. The placing of base course and pouring of concrete pavement was commenced in area 3 about November 11, 1943, and the pavement was completed in this area about December 18,1943.
About November 22, 1943, while paving was in progress in this area, it was discovered that 2 or 3 of the catch basins were approximately one foot above the finished pavement surface and had to be lowered on account of an error in the elevation on the drawings. The grade of the finished concrete pavement was almost flat, and the tolerance allowed in the finished surface was approximately equal to the gradation specified for drainage, which caused the water to stand on the paved area in some places. And for this reason other catch basins were lowered to effect proper drainage into the catch basins.
The plaintiff was paid $300, under item 2 of Modification 13, for lowering the drainage structures and the grade for pavement.
The plaintiff was also paid $260 for the revision of eight catch basins to conform to the revised concrete grade under item 20, of Modification 13.
AREA no. 2
45. Because of the increase in excavation and fill and the delay in removal of steel scrap in area No. 1, and the con *363 struction of a new steam tunnel in area 3, these areas could not be completed for paving in regular order. Grading operations were first shifted to certain small areas where no drainage installations were required; and concrete pavement was commenced in these areas October 9.
Grading operations were shifted to area No. 2 in the extreme northwest section of the project about October 3. The crushed stone base and concrete pavement was commenced in this area October 14. The plaintiff’s general superintendent had been advised orally on October 12 that a 42-inch force main leading from the pumping station to the north side of the project would traverse the eastern part of this area, but had failed to inform the concrete superintendent.
After one or two lanes of concrete had been placed the plaintiff was advised to omit a strip of concrete across this area to permit the installation of the force main pipe; that the installation of this force main had been contracted with the plantiff’s subcontractor, Drainage Contractors, Inc., and that it was estimated that the delivery of material for the work would be made in about two weeks.
The force main was not indicated on plaintiff’s contract drawings. It was thereafter staked out diagonally across this pavement area, including the firing line apron, bisecting 11 of the 20 foot lanes of concrete, but altogether missing 3 of them. A strip of concrete about 75 feet wide in each lane was omitted, and that which had been poured had to be torn out for a similar width.
After the pipe was delivered that portion of the force main line traversing the pavement area was installed in 3 or 4 days. Neither the force main line nor the pumping station was complete for drainage disposal until after the plaintiff had completed its work.
The sewer subcontractor could not properly coordinate its work with the grading and paving because of the shifting of operations. The north-south drainage line along the approximate center of the principal part of area 2 had not been completed when paving operations were in progress, and for this reason the transit mixing trucks delivering con *364 Crete coüld not run the full lane, but had to back out on the same lane where entrance was made.
The plaintiff had to return to pave the gap left open by the force main line, which necessitated hand finishing of the concrete. The plaintiff did not complain of the delay and interference with its paving operations by the installation of the force main across this area. No allowance was made for plaintiff’s increased costs in placing concrete in this area, nor for returning to fill the open area at a later period.
The plaintiff’s drainage subcontractor diverted some of its men and equipment to the installation of the force main through the pavement area, while plaintiff’s work was in progress. The plaintiff made no protest against the award of this work by defendant to its subcontractor.
AREA NO. 4
46. Grading was commenced in parts of area No. 4 about the end of September 1943. An undisclosed water main was uncovered around building 134, at the same elevation as the proposed drainage sewer. A small amount of additional pipe and special fittings was required to carry this water line under the sewer pipe. Because of the delay experienced in obtaining special pipe fittings, the excavation for this work remained open several weeks.
Also a special chamber was required in this area at the crossing of the 36-inch drainage line and the steam tunnel. The additional work required was paid for under Modification 12.
Concrete pavement was commenced in this area also on or about October 14, 1943, in a small strip immediately north of building 20. It was not completed until sometime in December 1943.
AREA NO. 5
47. A number of fire alarm cables which had been laid between the buildings in area No. 5 and the warehouse area were broken during grading and drainage operations. They were only about 1% to 2 feet deep, and parallel with the sewer main running north through the center of the area between *365 these buildings. They were not shown on the contract drawings.
The drainage contractor broke these cables several times, and had employed a line splicer who was regularly employed by the Bell Telephone Company, to work nights and repair them. The Government finally supplied new cable, which was placed by the plaintiff and paid for under Modification 11 in the sum of $1,560.
Concrete pavement was commenced in area 5 November 9, 1943. The base course was placed during the early part of November 1943, but the drainage system was not complete, and a portion of the base course became chewed up by use of heavy equipment. It was replaced December 17-18, 1943, and claim is made therefor under the third cause of action herein. The concrete pavement was not completed in this area until about January 1944.
WAREHOUSE AREA
48. Narrow strips of concrete were required in front of the buildings in the warehouse area, and the large spaces between the buildings were surfaced with crushed stone hard-standing. Grading in this area was held up about one week for Government surveys. Grading in other areas had not been completed, but was held up on account of changes and it was necessary to move grading equipment from one area to another, and sometimes it remained idle for lack of available work areas. The fire alarm cables were broken in this area by grading and drainage work which also delayed completion of work in this area.
49. The 6-inch water main running along the west side of buildings 119, 120, 123, 124, and 133 of the warehouse area did not appear on the contract drawing. On November 2, 1943, the Government took elevations of the top of this water line. It was determined that the water line would have to be lowered to provide sufficient insulation against freezing, and plaintiff was orally requested to submit estimates for this work.
A series of sewer pipe lines required by the contract between these buildings, intersected the water line at right angles, and it was found necessary to provide three-foot *366 sections of additional pipe and special fittings to carry the water line underneath the sewer lines. After some discussions with plaintiff’s representatives, it was finally determined that it would be cheaper to install a new water line at the lower elevation, but parallel with the old line.
A written proceed order was issued December 7, 1943, for the installation of the new 6-inch water line complete with fittings. Modification 4, dated December 7, but submitted to plaintiff December 20,1943, provided for the lowering of this water line, and the transfer of some 5 fire hydrants to the new water line. It would have normally required about one week to install this water line.
The installation of this water line and fittings was subcontracted by plaintiff to T. O. Murphy Company. The subcontractor experienced considerable delay in acquiring the pipe and fittings, which required a priority rating; and the installation of this pipe line was not completed until January 12,1944.
In the meanwhile, during the extended period of the discussions of the plan and costs of lowering the water line, the plaintiff had completed grading the area, brought in stone and stockpiled it for lack of other areas to place it, and eventually spread and compacted the base course over the water line, considering it more advantageous to complete the operations in this area and get its equipment out for use on other work, rather than leave the area partially open.
The plaintiff was paid $4,048.60 for the installation of 896 feet of 6-inch water line and five water hydrants.
On January 1, 1944, the contracting officer submitted to plaintiff for its acceptance Modification 6, dated December 14, 1943, which extended the contract period by 29 calendar days on account of the installation of the 6-inch water line, which delayed the crushed stone surfacing in this area. This modification was accepted by the plaintiff without prejudice to any claim it might have for increased costs or quantities.
AREA NO. 6
50. A number of minor changes were made in area 6 around building 160, none of which materially affected the performance and completion of the contract work.
*367 THICKENING EDGE OF CONCRETE PAVEMENT
51. About November 17, 1943, the plaintiff was requested to submit a proposal for the thickening of edges of all concrete bordering along railroad tracks, from 6 to 12 inches, and sloping upward on the underneath side back about 30 inches to the normal 6-inch thickness. The edges of concrete pavement requiring thickening were the north and south sides of area 1, the north and south sides of area 3, and the middle lanes of this area where the railroad cut through the center thereof.
At that time most of area No. 1 had been paved, and it was necessary to cut out the base course and lower it for additional concrete, requiring all hand labor. Concrete pavement in area 3 had only started a few days previously. In order to thicken the edges 12 inches, the plaintiff had to employ 12-inch wood forms, 2 inches thick. They would not support the heavy finishing machines, and concrete for the lanes along the railroad tracks had to be hand finished. The thickening of edges of the concrete pavement required about one week.
The Government first ordered the concrete edges thickened 11 inches, and later changed it to 12 inches. The plaintiff submitted a price of 85 cents a linear foot for this work on November 22,1943. On January 29,1944, Modification No. 8, dated January 10,1944, was submitted to plaintiff for its acceptance, at a price of 70 cents a linear foot. It was accepted without qualification, and the plaintiff was paid for 8,412.14 linear feet, in the sum of $5,888.50 for this work.
OTHER DELAYS
52. Excavation. The plaintiff’s subcontractor for excavation and grading had adequate equipment to perform all work of this type, other than the removal of scrap which it declined to handle. It had its own operators and helpers, and had no difficulties in obtaining labor.
Grading was delayed by additional muck excavation and the discovery of steel scrap in area 1; the construction of the steam tunnel in area 3; drainage operations on the firing line apron of area 2, requiring longer hauls; the replace- *368 merit of fire alarm cables in area 5 and the warehouse area, and the lowering of the 6-inch water line along the west side of the warehouse area.
This subcontractor was held up awaiting grades by the Government around buildings 101 and 102, and about one week for similar surveys in the warehouse area. It was delayed by rain some 5 or 6 days during the entire period.
The plaintiff’s pavement work was delayed to some extent by reason of the fact that the grading operations could not be completed in any one area.
The main grading work was completed about the end of November 1943, and follow-up grading continued thereafter. All grading was completed about the end of December 1943, or January 1944.
53. Drainage. Most of the drainage pipes, catch basins and manholes were required in the pavement areas. (Findings 13 and 14.) Drainage installation normally would start at the lower, or discharge ends of the system, but in order to expedite paving operations, the pipes and other installations were constructed first in pavement areas. They were designed only for draining the surface water after pavements were completed. Areas 1, 3 and 4 were drained into an open ditch on the east side of the project, but all other principal pavement areas were designed to drain into a well at the pumping station north of building 160. The pumping station and the lead-out force main were not constructed until after all of the plaintiff’s drainage systems were completed.
The drainage subcontractor had adequate key men and experienced pipe laying men on the job, but had some difficulty in obtaining sufficient common laborers. Manholes, catch basins and junction chambers were excavated by hand, except 6 or 8 of the larger units which were excavated by use of a clam shovel. The manholes were changed from concrete to brick construction upon Government orders direct to the subcontractor, and no written change order was issued for this change. This change did not delay the drainage work. Catch basins were located in the lowest points in the drainage areas, and their construction was delayed to some extent by rains.
*369 The principal reason for less expeditious performance of the drainage work was the shortage in labor, and particularly common laborers. The pay schedule in plaintiff’s contract stipulated the minimum wage, which was also the maximum, that could be paid.
The drainage subcontractor could have used more form carpenters for the construction of catch basins, since these units were spread all over the areas. The drainage work was generally completed ahead of the paving work, but in some cases openings for catch basins had to be left for their construction, and paved later.
54. Because of the shifting of operations from place to place, .the drainage subcontractor could not always keep ahead of the paving operations. Trenches for pipe lines remained open only for a matter of hours, and were back-filled as soon as the pipes were laid.
The completion of drainage work in areas 3 and 4, around buildings 18 and 20, was delayed because of the necessity of obtaining special fittings for revising the undisclosed water line.
The. drainage subcontractor’s work was delayed about three days by rerouting the 54-inch sewer main northwest of building 160. This large sewer main was changed, upon plaintiff’s suggestion, to avoid any interference with the operations of plaintiff’s storage area and concrete mixing operations. It was routed diagonally south of this area, crossing a 6-inch water line and the railroad tracks on a skew, resulting in some damages to the water line, and some delay. This delay to the drainage work did not interfere with paving operations, since no new pavement was specified in this area.
All drainage work was completed the first week in January 1944, and the placing of pipes in the paving area that was performed by Lametti and Lametti was completed December 9, 1943.
55. Concrete and hardstanding pavements. The plaintiff could not maintain progress in concrete paving required to complete the contract work by December 2, 1943, because of the disruption of its schedule, and the shifting of the work from place to place.
*370 The- plaintiff had rented and used 8,000 feet of 7-inch steel forms in placing the 6-inch concrete pavement. Both 6-inch and 7-inch forms were used, but it would have been more practical to have employed 6-inch forms, since the finishing machines that rode the steel forms finished the concrete flush with the top of the forms.
The monthly average rainfall during the performance of plaintiff’s contract was below normal. But much of the rainfall that occurred was in the latter part of October and' the first half of November 1943. From October 9, 1943, when concrete work was commenced until January 1, 1944, there were 13 days when no pouring was performed on account of weather conditions, of which 5 days occurred prior to December 3,1943, on account of rain.
The plaintiff employed an average of only 50 men up until its work of placing base course and pavement started. These were adequate. Thereafter it became necessary to haul men back and forth from Sandusky, Ohio, and work the men longer hours; and the plaintiff could have used more and better qualified workers to attain better progress.
5.6. Changes in the large pavement areas greatly increased the amount of hand finishing of the concrete pavement. The thickening of edges along the railroad tracks in areas 1 and 3 required hand finishing of the concrete. Area 3 also required hand finishing of concrete pavement over the steam tunnel. Almost one-third of area 2 required hand finishing in paving of the strip left open for the force main and incomplete sewer lines down the center of this area.
The new steam tunnel construction authorized in area 3 required a large number of form carpenters, and on October 23, 1943, the assistant resident engineer authorized one of the inspectors to go out and locate additional carpenters, and 4 or 5 additional men reported for employment on plaintiff’s work.
The defendant contends that the plaintiff could have employed more and better equipment for accelerated progress, and did make requests that a sprinkler, a road duster and more trucks be obtained during the early period of performance.
*371 ' The plaintiff used two crews in concrete paving, but could not regularly employ tbe second crew with mechanical finishing machines, because of much hand finishing around buildings and by reason of changes in the large paving areas where mechanical finishing would have been employed.
. The plaintiff had rented 2 Jaeger late model finishing machines with 20-foot sweeps, and two other finishing machines. Plaintiff also owned one, which was employed on the job.
The plaintiff’s work was not materially affected by any lack of equipment, except as indicated in finding 16.
57. Specification4^10 (c) (2) provides:
Gold weather. Concrete shall not be placed when the ambient atmospheric temperature is below 32° F., nor when the concrete is likely to be subjected to freezing temperatures before final set has occurred unless specifically authorized by the contracting officer in writing. When so authorized, the materials shall be heated in order that the temperature of the concrete when deposited, shall be not less than 50° F. nor more than 80° F._ All methods and equipment for heating shall be subject to the approval of the contracting officer.
At a conference November 17, 1943, the contracting officer insisted that concrete pouring be continued with the use of calcium chloride, even though the temperature be below 32 degrees F. By letter of November 18, 1943, the contracting officer authorized the plaintiff to continue concrete work while the temperature was below 32 degrees F., with the necessary protection to prevent freezing, but in no case when the temperature was below 24 degrees F.
By letter of December 17, 1943, the contracting officer directed the plaintiff to continue placing concrete when the temperatures were 15 degrees F. or above. This letter states in part:
The concrete paving shall be placed on subgrade felt, the felt to be layed on the subbase just prior to concrete placement, the temperature of the felt shall be above 32 F. Concrete shall be heated to 80 F. for placement. The Contracting Officer assumes the responsibility for any damages to the concrete from frost in the subgrade, however, the Boss Company is held responsible for main- *372 taming adequate ambient temperature on the upper surface or the concrete paving. In freezing weather, concrete shall be maintained above 50 F. for at least the first five (5) days of the curing period. Concrete operations shall continue when temperatures are 15 F. or above.
58. Plaintiff asked for extensions of time on two occasions. In a letter to defendant dated November 30, 1943, plaintiff stated:
We respectfully request an extension of time to complete Contract No. W-33-015-eng-155 and submit the following reasons as causes for the delay in completing this project:
1. Upon commencing excavating work on this project, we were required to excavate a great deal more than was originally planned in the area east of Building No. 20. This area was set up as “Priority Area No. 1” and, therefore, completion of the excavation in this area delayed the progress of the job about 14 days due to the large amount of additional excavation. The additional excavation in this area also required a different type of excavating equipment than was originally planned and this also caused delay in securing same.
2. Steam Tunnel construction and interference of 42" sewer line with tunnel necessitated design of a special drainage structure in area west of Building No. 18 and north of Building 148. The design of this special structure, changes in design of the steam tunnel, and the price negotiations on the tunnel delayed construction of tunnel a considerable length of time. This, therefore, in turn, caused a delay in completion of excavation and paving in- this area. .
3. Unusually severe weather conditions consisting of rain and snow during-the last part of October and the first half of November saturated the eai’th subgrade of paving areas to such an extent that paving progress was slowed down. It was found to be impracticable to construct the base course in most areas during the period due to this saturated soil condition. Also, it was impossible for equipment to work on these unsuitable and unstable areas satisfactorily.
In an attempt to keep paving operations going, base course construction was carried on but this resulted in further delays due to the base course then becoming unstable and, therefore, unfit for paving operations and, *373 in some cases, required removal and reconstruction'of the base course, causing still further delay.
4. Extreme difficulty and delays in securing labor and equipment repair parts for ourselves and for our subcontractors.
We believe in view of the above facts that you will agree that an extension of time sufficient to complete this contract is in order.
In a letter dated December 30, 1943, plaintiff made a substantially similar request, except that it added two paragraphs as follows:
5. Our inability at present to complete 6,000 square yards of Crushed Stone Surfacing west of Buildings 118j 121,124 and 133 because of the recent added work of installing a new water line in this area.
6. The greatly increased quantity of Base Course Material needed to complete the contract over quantities set up in the original schedule.
We believe in view of the above facts that you will agree that an extension of time sufficient to complete this contract is in order.
These were plaintiff’s only written requests for extensions of time.
59. The plaintiff was granted extensions of time as set forth in previous findings, to wit (Findings 3, 43, 49) :
15 days for delay during negotiations for the type of steam tunnel to be installed by Modification 3;
29 days for delay in placing the crushed stone surfacing by reason of the installation of new 6-inch water lines, by Modification 6;
237 days resulting from causes beyond plaintiff’s control and without its fault or negligence, by Modification 15.
The plaintiff accepted Modification 3 without any reservation. Modifications 6 and 15 were accepted, “without prejudice to any claim this Company may have for increased costs or quantities, under said contract.” The extensions of time under Modification 15, from January 15 to September •8, 1944, largely covered the period of negotiations or other modifications and administrative adjustments in the quantities performed under the contract and modifications, which were not completed until September 1944.
*374 Modifications 11,12,13, and 14 each, were accepted with a reservation, reading in substance:
Nothing herein contained shall be interpreted or construed as waiving any other claims which this Company may have by reason of any other item of alleged extra work or for any increased costs resulting from delay in performance not the fault of this contractor.
'Modification 11 covered allowances of $1,000 for the removal of steel scrap in area 1, and $1,560 for the replacing of fire-alarm cables. Modification 12 covered 10 items of changes, including the relocation of some 1,384 feet of water and sewer lines, and other drainage work for $4,745.30. Modification 13 contained 21 items o 1 contract changes and allowances which increased the contract by the net sum of $4,667.91. Modification 14 contained adjustments for increases and decreases in quantities performed as compared with original estimates for contract items and modifications, with net increases of $21,018.20, which were adjusted in voucher 8, to September 8,1944.
60. On October 7,1944, the plaintiff executed a qualified release, reserving its claims for all items set forth in its petition in this case, including its claim for delays and increased costs of performance during cold weather in the amount of $74,792.74. On October 17, 1944; final payment was made under the contract, except for $1,000 which was included and paid on Estimate 9, along with the award of $2,520.25 by the Board of Contract Appeals, June 11, 1948.
The net increase in the plaintiff’s contract by Modifications and by net increases of quantities of the original items was $63,053.03, or 8.85 percent.
'61. On August 9, 1944, the plaintiff submitted its claim for $74,792.74, representing its computed increased costs of performance after December 2,1943. This claim concluded:
Accordingly, the above claim is hereby submitted for excess costs, over and above the amount contained in change orders, representing excess costs not included in the change orders, and resulting from the delays necessarily incurred in the performance of the contract by reason of such change orders which forced the com-plétion of the contract over into the expensive working period following December 2, 1943, for-which nothing *375 was included either in the contract unit prices or in the respective change orders.
62. On October 7, 1944, the contracting officer denied the plaintiff’s claim and advised the plaintiff in part.:
It is considered that the increased work which was required of you by the' above modifications was all of such a character as might reasonably be expected in the performance pf a contract of this scope arid character and was not of such volume as to give rise to adjustment of unit prices in the contract by virtue of extended time for performance. An analysis of field reports indicates that the weather during the original period of performance was especially good for that vicinity, notwithstanding that there was one period of approximately thirty days during which • rainfall was rather frequent though not particularly heavy in amount. Field inspection reports also indicate that during the good weather the work was consistently behind schedule.
Accordingly, it is the decision of this office that the alleged increased cost of the work were not the result of acts of the Government but rather due to delays of the Contractor in failing to so schedule its work as to complete the entire contract within the original time. * * *
63. On November 6, 1944, the plaintiff appealed from the decision of the contracting officer to the Secretary of War, and set forth the various items of work and changes, which it alleged delayed the performance of its work beyond the original completion date of December 2,1943.
64. Following plaintiff’s appeal on these claims, the contracting officer prepared his findings' of fact which were furnished to the Secretary of War and to the plaintiff. The contracting officer found that negotiations with the plaintiff for the contract in suit were concluded September 19, 1943; that the plaintiff had alleged its proposal made no allowance for winter protection of the work, but that the contracting officer held under paragraph 2-20 of the specification such protection was specified and required and had ascertained that each of the other bidders did include an allowance for such costs; that the plaintiff represented by *376 Walter Ross, personally, agreed at the time negotiations were concluded that winter protection of concrete was covered by the specifications and “that at no time in the future would a claim be made for any additional funds due to winter placing of concrete.” The contract was executed a few days later, as of September 14,1943, without protest.
65. The contracting officer further found that delays on the part of plaintiff resulted from:
a. Failure to provide sufficient or competent supervision of work or of subcontractors.
b. Failure to comply with specifications and directives.
c. Failure to exercise precaution in connection with existing utilities.
d. Failure to provide enough equipment.
e. Failure to provide equipment of right type.
f. Failure to keep in repair the equipment which was available.
g. Failure to provide adequate manpower.
h. Failure to come to agreement with subcontractors . and suppliers.
i. Failure to award subcontracts promptly.
j. Failure to pay suppliers, which delayed deliveries with resulting delay to the performance of this contract.
The foregoing findings were based generally upon the daily reports of the chief inspector, which were quoted at length by the contracting officer. These daily reports were not filed in evidence in this case.
66. The contracting officer also found that the steel scrap discovered in area No. 1, was removed September 30, to about October 8, 1943, and remained piled upon the area where it was placed by the dragline October 9, 1943; that upon the insistense of the chief inspector it was finally bulldozed off the work area so that other work could proceed, but was not hauled away to a waste area Until the end of December 1943.
67. The contracting officer reported that the irregularly shaped pavement area, known as area No. 3, extended 950 feet west of building 18; that the steam tunnel extended less than one-quarter of the length of this area, and presented *377 interference to less than one-third of the total area. In connection with its construction the contracting officer stated:
It is true, that late in September and early in October, before it became necessary to have personal representatives of the District Engineer at the project, the Government unavoidably delayed a decision with regard to the type of tunnel to be installed. However, the contractor was fully compensated for this delay by Modification No. 3, Extension Order, extending the’contract time to 17 December 1943.
68. In regard to the installation of a new 6-inch water line along the west side of warehouse buildings 119, 120, 123,124, and 133, the contracting officer reported, in part:
The contractor correctly contends the lowering of this water line delayed the base course and stone surfacing over the line. Modification No. 6, Extension Order granted the contractor an extension of 39 [sic] days to 15 January 1944 because of this delay.
Modification 6 extended the contract period 29 days.
69. On December 17, 1947, the Secretary of War, acting through the Army Board of Contract Appeals, after reviewing the facts and taking testimony of the interested parties, sustained the plaintiff’s appeal only insofar as it concerned the use and cost of calcium chloride in curing concrete during cold weather. It was found that the contracting officer directed the use of calcium chloride in the concrete commencing, in November 1943, and had authorized the placing of concrete, when the ambient atmospheric temperature was below 32 degrees F. and to a minimum of 15 degrees F. Since the contract contained no specification requiring the use of calcium chloride, the Board held that the plaintiff was entitled to a change order covering its cost for this item.
70. The Board denied the appeal in all other respects, and stated in part:
The changes ordered by the Government were reasonable. Mere number of items included in change orders is not alone indicative that the Government had abused its privilege to issue such orders. Nor is the number of such orders indicative that the specifications were inadequate.
*378 Modification 16 was issued April 20, 1948, covering an allowance for calcium chloride used in 10,081 cubic yards of . concrete, at 25 cents a cubic yard. It was included in voucher No. 9 of the same date, and paid June 11, 1948, in the sum of $2,520.25.
71. The plaintiff was unreasonably delayed by the defendant for 29 days during the period November 2-to December 7, 1943, before notice to proceed with the installation of a new 6-inch water line in the warehouse area. The plaintiff was granted an extension of time of 29 days by Modification 6,. which was accepted by the plaintiff without prejudice to any claim for increased costs resulting. The 29 days delay incident to the water line installation projected the completion of the contract work for a period approximately equivalent to the time extension granted plaintiff by Modification No. 6.
As to all other changes, resulting from undisclosed conditions or otherwise, the Government representatives authorized and directed the plaintiff to proceed with reasonable promptness, and issued modifications to equitably compensate the plaintiff for the additional costs, except as noted in finding 43.
72. The plaintiff sustained a loss of $59,956.91 in the performance of the contract, with modifications. The plaintiff made no allowance in its bid for winter protection to its work, nor for performance after December 2, 1943. Its calculation for its bid price in placing concrete was based upon its labor hours of performance on another paving job near Madison, Wisconsin, where some 177,000 square yards were placed. .That particular job was performed in record time.
73. The pouring of concrete pavement was completed January 12, 1944, or 41 days beyond the original contract termination date. Crushed stone surfacing and. other finishing work were performed thereafter; and all contract work, other than corrective work of replacing damaged concrete, was completed February 19, 1944, or 79 days beyond the original termination date.
The plaintiff incurred additional costs by reason of placing concrete during cold weather after December 2,1943. *379 Its job overhead was proportionately increased by reason of the increased period of performance.
74. Winter- -protection. The plaintiff mixed and placed approximately 25,354.5 cubic yards of concrete. It commenced heating the concrete November 14, 1943. Approximately 7,098.5 cubic yards were heated and placed prior to December 2,1943. Concrete heated and placed after Decern-, ber 2nd, was 7,628.5 cubic yards, for which its subcontractor, was paid 25 cents additional a cubic yard, or the sum , of $1,907.13.
At the termination of the original contract period December 2, 1943, the plaintiff made an agreement with its concrete .subcontractor, Nicholson Concrete Company, that whenever the subcontractor’s men had reported for work and the plaintiff could not receive and place concrete, such, men would be paid for reporting. The plaintiff paid $59 for men reporting without being able to work.
This agreement further provided that the plaintiff would pay its subcontractor an additional 50 cents a cubic yard when deliveries in any one day were limited from 250 to 350 cubic yards, and an additional $1 a cubic yard when de-, liveries of less than 250 cubic yards could be received in. any one day. The plaintiff paid its concrete subcontractor $1,993 after December 2,1943, under this provision, in addition to the regular contract price for concrete mixed and delivered by it.
The plaintiff purchased and used additional hay and straw after December 2,1943, at a net cost of $549.63, for protecting concrete during the curing period.
75. The plaintiff incurred labor costs for the protection-of concrete during cold weather in the sum of $5,442.53. This sum had been taken from payroll allocations by- the plaintiff’s cost accountant, but such cost analyses have been lost or destroyed. Since the period for which such labor-costs was not furnished in evidence, it must be concluded that such-allocations represent the total costs for such allocations. The plaintiff heated some 14,727 cubic yards of concrete for. placing in cold weather and it is reasonable to conclude that approximately the same quantity required protection after *380 it was placed. The total labor costs of $5,442.58, represent 37 cents a cubic yard. The plaintiff heated and placed 7,628.5 cubic -yards after December 2, 1943, for which such labor costs would be $2,822.55.
The plaintiff’s total increased costs of mixing, placing and curing concrete from December 2, 1943 to January 12, 1944, when the concrete work was completed, was $7,331.31. The increased costs attributable to defendant’s unreasonable delay of 44 days is; therefore, $7,331.31.
76. Job overhead. The plaintiff’s chief engineer F. N. Brooks was engaged in the field to lay out the work in accordance with grades established by defendant for paving and hardstanding surface paving. Concrete pavement was completed January 12, and hardstanding was completed January 24, 1944. He was released January 19, 1944, as soon as his work was completed. Some supervision and office expense was continued until March 1,1944.
The plaintiff’s costs after December 2, 1943, were $685.71 for its engineer, $3,916.68 for supervision and $1,566.79 for job office expense, or a total of $6,169.18; upon which its payroll taxes and insurance were $639.74. Its total job overhead and supervision expense was $6,808.92.
' The plaintiff’s average daily cost for overhead and supervision for the 79 days of performance period from December 3, 1943, to February 19, 1944, was $86.19 a calendar day.
The cost for the 44 days for which we have found plaintiff was unreasonably delayed amounts to $3,792.36.
77. Equipment expense. The plaintiff rented a substantial quantity of equipment in the performance of this contract, in addition to the use of its own equipment. Eented equipment was substantially all paid for at a monthly rate equivalent to approximately $12,034.17. It appears from the evidence and list of equipment rented that units of each type were released as soon as they were no longer required, thereby terminating the rental expense.
During the period from December 3, 1943 to January 12, 1944, inclusive, the plaintiff paid rentals for equipment of $10,182.14, and for equipment retained for use thereafter it paid $1,585. Total rental payments after December 2,1943, *381 of $11,767.14 were made. Such, payments represent 62 percent of the monthly rate up to January 12, and 13.17 percent of a month thereafter.
Plaintiff also employed a substantial lot of equipment which it owned. The period of use and dates of release of its own equipment from this project are not determinable from the evidence. The ownership expense of this equipment under normal use was reasonably $2,115 a month. Since the plaintiff’s equipment was generally of different types than that rented for this contract, it is reasonable to conclude that, by using the same degree of prudence, the equipment owned could have been released in like proportions as the equipment rented. On this basis the ownership expense for equipment owned and employed from December 3,1943 to January 12,1944, would be 62 percent of the monthy rate for 41 days, or $1,792.11, and thereafter 13.17 percent of one month’s expense, or $278.55, making total ownership expense of $2,070.66.
The plaintiff’s total cost for equipment employed on this contract after December 2, 1943, was $13,837.80, averaging $175.16 a calendar day for the 79 days terminating February 19,1944.
The cost for the 44 days for which we have found plaintiff was unreasonably delayed amounts to $7,707.04»
78. The plaintiff claimed $4,927.99, representing costs after December 2,1943, of maintenance and supplies for equipment employed. It also claimed $11,876.12 for wages, payroll taxes and insurance, for the employment of machine operators after December 2,1943.
The plaintiff’s cost of equipment maintenance and supplies for the entire performance of its contract averaged approximately 28.82 percent of its equipment rentals and ownership expense. Its payments to machine operators after December 2,1943 were $11,490.56, of which sum $365.98 was charged to its subcontractors.
Both of these items represent operating expenditures in connection with plaintiff’s performance after December 2, 1943. It is not proved that they were increased by reason of delay.
*382 79. The plaintiff claimed $14,671.28 as loss of labor’ efficiency by working during cold weather, representing 50 percent of its net payrolls after December'2, 1-943,-after excluding supervision and foremen, machine operators,, and labor costs attributable to winter protection of concrete. The plaintiff has not furnished any substantial proof of what'the loss of efficiency might be, if any. -
' The defendant’s auditor made certain comparisons of plaintiff’s total labor and performance records on its paving operations only. These analyses indicate increased costs for labor of 5.89 cents for each revenue dollar earned after December 2, 1943. On the basis of earning performance of $99,912.24, after December 2, 1943, such increase would be $5,884.83. This increase would be offset in part by plaintiff’s increase in labor for winter protection in the sum determined at $2,822.55. The difference of $3,062.28 represents an-average of $74.69 a calendar day for the 41 days of paving operations beyond December 2, 1943.
The increased cost attributable to defendant’s unreasonable delay of 44 days is, therefore, $3,062.28.
80. The plaintiff claimed its cost of replacing concrete . placed and damaged during cold weather. This work was performed in June 1944, at a cost of $2,955.10.
The contracting officer on November 18, 1943, authorized plaintiff to place concrete while the temperature was below freezing, but not below 24 degrees F. and on December 17, 1943, directed that plaintiff continue placing concrete as long as the temperature was at or above 15 degrees F. The plaintiff did not protest the placing of concrete below freezing as directed. There is no evidence that the plaintiff protested the performance of this corrective work when directed to do so.
81. Plaintiff’s increased costs for the 44 days of delay described in findings 43 and 71 were, therefore:
Costs of mixing, placing and curing concrete— $7,331. 31
Overhead and supervision-'' 3, 792.36
Equipment cost_:-7,707.04
Eoss of efficiency_•- 3,062.28-
$21,892.99
*383 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States twenty-one thousand eight hundred ninety-two dollars • and ninety-nine cents ($21,892.99).

 See Modification No. 1.

 See Modification No. 1.